**PENOBSCOT NATION**

v.

**Arthur STILPHEN and James E. Tierney.**

Supreme Judicial Court of Maine.

Argued May 2, 1983.

Decided June 7, 1983.

Thomas N. Tureen (orally), Neil T. Leifer, Portland, for plaintiff.

William H. Laubenstein, III (orally), William R. Stokes, Andre Janelle, Asst. Attys. Gen., Augusta, for defendant.

Before McKUSICK, C.J., and GODFREY, NICHOLS, ROBERTS, CARTER and WATHEN, JJ.

McKUSICK, Chief Justice.

For approximately six years the Penobscot Nation has been operating weekly

beano games, as defined by 17 M.R.S.A. § 311(1) (1983), on the Penobscot Indian Reservation. The games are usually held on Sundays and are open to members of the general public at prices ranging up to $45 per person. An individual prize of as large as $25,000 has been awarded in a single "Super Bingo" game. The weekly games draw many hundreds of players to the Penobscot reservation from all over Maine and beyond. The games generate gross revenues of approximately $50,000 per month; the net profit is used to fund various tribal governmental services and programs, including snow and rubbish removal on the reservation, police and health services, and home improvement programs.

In October, 1982, defendants James Tierney and Arthur Stilphen, Maine's Attorney General and Public Safety Commissioner, respectively, advised the Penobscot Nation of their intent to move against the Nation, or its officers, employees and agents, for violating the state's beano law. The state has provided in chapter 13–A of title 17 M.R.S.A., §§ 311–325 (1983), for the licensing of beano games under certain circumstances. Section 312 states,

> No person, firm, association or corporation shall hold, conduct or operate the amusement commonly known as "Beano" or "Bingo" for the entertainment of the public within the State unless a license therefor is obtained from the Chief of the State Police.

The Penobscot Nation has no current beano license; indeed, it admits that its game is not eligible for a license under chapter 13–A, because section 314 and 315 permit the Chief of the State Police to issue licenses only to volunteer fire departments, agricultural fair associations, and certain nonprofit

organizations, as well as to "bona fide resort hotels" whose games return no profits to the hotels. Moreover, the Nation's games do not comply with the provision of section 312 prohibiting Sunday beano games, or with various regulations, promulgated by the Chief of the State Police pursuant to section 317, prohibiting the charging of admission fees and limiting to $200 the value of any single prize and to $1,000 the aggregate value of prizes awarded during any one occasion. Under section 325, a fine of up to $1,000 may be assessed against any "person, firm, association or corporation" violating any of the provisions of chapter 13–A.[1]

In December, 1982, the Nation sought from the Superior Court (Kennebec County) both a declaration that its beano game was lawful and an injunction prohibiting defendants from enforcing against the tribe the provisions of Maine's beano law. The Nation argued that chapter 13–A of title 17 does not apply to it because it is neither a person, a firm, an association, nor a corporation. In support of this proposition, the tribe cited 30 M.R.S.A. § 6206(1) (Supp. 1982–1983), which states that the Penobscot Nation, "within [its] Indian territories, shall have, exercise and enjoy all the rights, privileges, powers and immunities . . . and shall be subject to all the duties, obligations, liabilities and limitations of a municipality . . . ." A municipality, the Nation pointed out, has been held not to be a "person" or a "corporation"—at least for purposes of a wrongful death statute, *Chase v. Inhabitants of Town of Litchfield,* 134 Me. 122, 125, 182 A. 921, 923 (1936); and it argued that one does not ordinarily think of a municipality as a "firm" or an "association." The

---

1. Since by 17 M.R.S.A. § 325 only a fine may be imposed for an infraction of section 312, that offense is classified as a "civil violation." *See* 17–A M.R.S.A. § 4–A(4) (1983). The Maine Criminal Code, 17–A M.R.S.A. §§ 953, 954, also imposes criminal penalties upon any "person" who advances or profits from unlawful gambling, defined as gambling (which includes beano) that is "not expressly authorized by statute." For the present decision, we need not address the question whether the Penobscot Nation is a "person" for purposes of the criminal statute. See discussion at p. 482 below.

The seriousness with which the criminal law views any gambling not expressly authorized by statute is demonstrated by the severity of sentence to be imposed upon aggravated unlawful gambling (gambling not expressly authorized by statute from which the promoter gets more than $250 in any 24-hour period, 17–A M.R.S.A. § 953). That offense is classified as a Class B crime, punishable by imprisonment up to ten years and a fine for a natural person of up to $10,000 and for an organization of up to $20,000. 17–A M.R.S.A. §§ 1252(2)(B), 1301(1)(A), 1301(3)(B).

Penobscot Nation further asserted that even if the beano law is, by its terms, applicable to it, the game is an "internal tribal matter," which, under another provision of 30 M.R.S.A. § 6206(1), is "not subject to regulation by the State." The Superior Court ruled against the Nation and denied its request for an injunction, holding that 17 M.R.S.A. ch. 13–A applies to the Penobscot Nation and that it is not shielded by 30 M.R.S.A. § 6206(1) from state enforcement of the beano law. We agree.

I. The Applicability of the Beano Law

Chapter 13–A of title 17, prohibiting any "person, firm, association or corporation" from operating beano games without a license, cannot be fully understood unless its history is examined. In 1943, the legislature passed P.L.1943, ch. 355, "An Act Providing for the Licensing and Regulation of the Amusement Known as Beano." Sections 1 and 7 of the 1943 act contained the precise "person, firm, association or corporation" language that now appears at 17 M.R.S.A. §§ 312 and 325. The original bill, L.D. 834 (91st Legis.1943), did not specify who or what could obtain a beano license; before it was passed, therefore, it was amended so as to limit licenses to fair associations and various nonprofit organizations. Speaking in favor of an early version of this amendment, Senator Brown of Aroostook said its effect would be to keep racketeers out of Maine because "no one but the bona fide organizations mentioned here can run a game of Beano in the state of Maine." Legis.Rec. 1078 (1943). The next day, on the Senate floor, a later version of the amendment was debated. Senator Varney of York asked,

Is it intended by this amendment that nobody can have a license to play Beano except those organizations already mentioned?

Senator Friend of Somerset, a proponent of the amendment, replied, "Yes." Legis.Rec. 1153 (1943).

■ The history of the current beano licensing law thus demonstrates that the legislature intended that law to prohibit entirely the operation of beano games except by those entities issued valid licenses by the Chief of the State Police. The terms "person," "firm," "association," and "corporation" were used to reach every entity capable of operating a beano game. The fundamental objective in interpreting any statute is to determine the intent of the legislature in enacting it and to give effect to that intent. *Cummings v. Town of Oakland,* 430 A.2d 825, 829 (Me.1981), *cert. denied,* 454 U.S. 1134, 102 S.Ct. 988, 71 L.Ed.2d 286 (1982). That the legislature intended to permit beano games only where licensed was recognized correctly just one year after the beano law was first enacted; the State's Attorney General then wrote, "Whenever and wherever the amusement commonly known as Beano is conducted or operated 'for the entertainment of the public' a license must be obtained." Op.Me. Att'y Gen. (1944), *reprinted in* 1943–44 Me. Att'y Gen.Ann.Rep. 160.

■ Our interpretation of the language at issue in this case is reinforced by the fact that the general gambling laws in effect when the beano law was first adopted categorically prohibited all gambling, no matter by whom conducted. R.S. ch. 136, § 18 (1930), stated, "Every ... scheme or device of chance, of whatever name or description ... is prohibited," and set penalties for "whoever is concerned therein." R.S. ch. 136, § 1 (1930), levied a fine on "[w]hoever keeps or assists in keeping a gambling house," while section 2 of the same chapter provided for a fine of up to twenty dollars for "[w]hoever gambles, or bets on any person gambling." In short, the state of Maine in 1943 already prohibited gambling as a general matter; the legislature in that year acted to create a limited exception for certain specific entities eligible for beano licenses. If P.L. 1943, ch. 355, the direct precursor of current 17 M.R.S.A. ch. 13–A, were read to allow some entity to conduct beano games without a license from the Chief of the State Police, it would directly conflict with the laws prohibiting gambling by all entities capable of engaging in gambling or "games of chance." We will not read a statute to conflict with another statute where an alternative, reasonable interpretation yields harmony. *See State v. Rand,* 430 A.2d 808, 817 (Me.1981).

The scope of the beano law, its language having survived substantially intact since 1943, is the same today as it was when the law was enacted. 17 M.R.S.A. § 312, standing alone, therefore prohibits anyone and anything from operating a beano game—as "beano" is defined in section 311(1)—without a license from the Chief of the State Police. Moreover, the state's criminal gambling laws, now codified at 17–A M.R.S.A. ch. 39, §§ 951–958 (1983), declare today, just as they did in 1943, that all beano games conducted without a license are illegal. Section 952(4) defines "gambling" so as to include beano, and, by section 952(11), any gambling "not expressly authorized by statute" is defined as "unlawful." The only statute that could "authorize" a beano game is 17 M.R.S.A. ch. 13–A; in fact, section 951 of the criminal code expressly exempts from the application of the rest of chapter 39 any person licensed by the Chief of the State Police under 17 M.R.S.A. ch. 13–A. This explicit reference to the beano law indicates that the legislature in 1975 still considered it only a limited exception to the general no-gambling rule. *See* 17–A M.R.S.A. § 951 comment.

The definitions contained in section 952, together with the specific allusion to the beano licensing law contained in section 951, make it clear that in Maine all gambling, including beano, is still unlawful unless expressly permitted by state statute. The Penobscot Nation cannot obtain permission to conduct its beano games under 17 M.R.S.A. ch. 13–A or any other existing state statute. Therefore, even if it were to be considered a "municipality" for purposes of the beano law, it is prohibited by section 312 of title 17 from operating those games.

### II. The Scope of the Nation's Exemption from State Law

Relations between the Penobscot Nation, the State of Maine, and the federal government are now controlled by the federal Maine Indian Claims Settlement Act of 1980, Pub.L. No. 96–420, 94 Stat.1785, now codified at 25 U.S.C. §§ 1721–1735 (Supp. IV 1980) ("the federal act") and by Maine's Act to Implement the Maine Indian Claims Settlement, P.L.1979, ch. 732, § 1, now codified at 30 M.R.S.A. §§ 6201–6214 (Supp. 1982–83) ("the state act"). The Nation argues that by dint of 30 M.R.S.A. § 6206(1), which gives the tribe authority over "internal tribal matters" free from state regulation, it retains all of the inherent powers that, according to federal law, are recognized as an attribute of an Indian tribe's historical quasi-sovereignty. These powers, the Nation goes on to assert, include the right to raise money for tribal government and services by operating beano games on the Penobscot Indian Reservation, even though the games would otherwise be barred by state law. We cannot accept either of these two propositions. We conclude, first, that the Nation's inherent sovereign powers would in any event not include the right to run a beano game in violation of state law, and, second, that the federal and state acts have independently defined the sphere within which the tribe can operate free of state regulation, and that beano cannot be considered an "internal tribal matter" within that narrow sphere.

### A. Inherent Sovereignty

The concept that Indian tribes retain certain "original natural rights," defeasible only by the federal government and not by the several states, was first articulated by Chief Justice Marshall in *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 559, 8 L.Ed. 483 (1832). Using language both more sweeping and more eloquent than that found in any later judicial pronouncement, the Chief Justice held that Georgia could not convict a missionary, licensed by the federal government to preach to the Cherokee Nation, of violating a state law forbidding all white men from entering the Cherokee reservation without a permit from the governor of Georgia. "The Cherokee Nation," he wrote, "is a distinct community, occupying its own territory, with boundaries accurately described, in which the laws

of Georgia can have no force ... but ... in conformity with treaties, and with acts of Congress." 31 U.S. at 561.

The Supreme Court in time revised its view of the scope of an Indian nation's inherent powers. In *United States v. Kagama,* 118 U.S. 375, 381–82, 6 S.Ct. 1109, 1112–13, 30 L.Ed. 228 (1886), the Court stated that Indians are regarded, in the eyes of the law, as "a separate people, with the power of regulating their *internal and social relations,* and *thus far* not brought under the laws of the Union or of the State within whose limits they resided." (Emphasis added) In *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), the Court recognized that a tribe's inherent sovereignty did not render all activities conducted on a reservation immune from state regulation or action. "Essentially, absent governing acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." 358 U.S. at 220, 79 S.Ct. at 271. *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973), summarized the precedents neatly, saying that the "upshot" of federal Indian law is that "even on reservations, state laws may be applied unless such application would interfere with reservation self-government or would impair a right granted or reserved by federal law." The case immediately following *Mescalero* in the United States reporter, *McClanahan v. Arizona State Tax Commission,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), spoke specifically to the problem of state regulation of activities performed on an Indian reservation but involving non-Indians. *Williams,* said the Court, did not mean that Indians have an absolute right "to make their own laws and live by them"; rather, it provided that "the state could protect its interest up to the point where tribal self-

government would be affected." 411 U.S. at 179, 93 S.Ct. at 1266.

■ Recent cases have confirmed *McClanahan*'s suggestion that an Indian tribe's inherent powers cannot be judged in a vacuum, but must be weighed against the interests of the state in applying its laws and regulations to the tribe.

> Long ago this Court departed from Mr. Chief Justice Marshall's view that "the laws of [a state] can have no force" within reservation boundaries.... There is no rigid rule by which to resolve the question whether a particular state law may be applied to an Indian reservation or to tribal members.

*White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 141–42, 100 S.Ct. 2578, 2582–83, 65 L.Ed.2d 665 (1980). In holding that the state of Arizona could not impose a motor carrier tax or a fuel-use tax on a logging company owned by non-Indians but doing business exclusively with a tribally owned sawmill on an Indian reservation, *White Mountain* noted that the taxes would be used to construct and maintain state roads, but that the logging company in question did not use state roads, as its operations were confined to reservation land. Therefore, said the Court, Arizona had no "compensatory purpose" or "legitimate regulatory interest" in taxing the logging company other than the desire to raise revenue. 448 U.S. at 150, 100 S.Ct. at 2587.[2] *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), agreed that the State of Montana, and not the Crow Indians, had the right to license and regulate hunting and fishing by non-Indians on land inside the tribe's reservation to which the state had title. The Court stated that the Crows' inherent sovereignty included

> the power to punish tribal offenders, ... inherent power to determine tribal mem-

---

**2.** The holding of *White Mountain* was based upon the Court's conclusion that the federal government had preempted the field of timber regulation on the Apache reservation so as to "preclude the additional burden" of state taxes,

448 U.S. at 150, 100 S.Ct. at 2587, and did not depend on any determination that the tribe's "inherent" or "sovereign" powers prohibited the state taxation. See note 4 below for a fuller discussion of this distinction.

bership, to regulate domestic relations among members, and to prescribe rules of inheritance for members.... But exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.

450 U.S. at 564, 101 S.Ct. at 1257–58. Regulation of non-Indian hunting and fishing on reservation land owned by non-Indians "bears no close relationship to tribal self-government or internal relations," said the Court; therefore, "the general principles of retained inherent sovereignty did not authorize the Crow Tribe to adopt Resolution No. 74–05." 450 U.S. at 564–65, 101 S.Ct. at 1258.

Shifting our focus from the Court's attempts to articulate the content of an Indian tribe's retained sovereignty to its analysis of specific matters claimed to fall within a tribe's sphere of authority, we are unable to find a case on all fours with the controversy we are asked to resolve today. Although several lower federal court cases have allowed tribes to conduct beano or bingo games on their reservations in spite of state or local laws that appear facially similar to 17 M.R.S.A. ch. 13–A,[3] those cases were decided on the basis of specific federal

statutes instead of federal Indian common law.[4] The Supreme Court has given us relatively few decisions clearly bottomed on the concept of inherent tribal authority rather than analyses of specific treaties or federal statutes. In fact, some commentators believe that "the preemption analysis has been the only sound and consistent basis for decision," and that even in *Worcester v. Georgia* the Indians' right of self-government existed only "because it had been recognized and allowed to continue in the relevant treaty." Mettler, *A Unified Theory of Indian Tribal Sovereignty,* 30 Hastings L.J. 89, 112–13 (1978). Under this view, the federal precedents are of little help to a court faced with a claim of inherent sovereignty by a tribe that has had little or no historical relationship with the federal government. *Id.* at 120–21.[5]

In a handful of Supreme Court opinions, however, the Court has explained its decisions in terms of the inherent sovereignty doctrine alone. From those cases, a few points are clear. A tribe has the inherent power to try members of that tribe for crimes committed against fellow members on the reservation, *United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978); *Ex Parte Crow Dog,* 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030 (1883), but

---

**3.** *See, e.g., Barona Group of Captain Grande Band of Mission Indians v. Duffy,* 694 F.2d 1185 (9th Cir.1982), *petition for cert. filed,* —— U.S. ——, 103 S.Ct. 2091, 77 L.Ed.2d 301 (1983); *Oneida Tribe of Indians v. State of Wisconsin,* 518 F.Supp. 712 (W.D.Wis.1981); *Seminole Tribe of Florida v. Butterworth,* 491 F.Supp. 1015 (S.D.Fla.1980), *aff'd,* 658 F.2d 310 (5th Cir.1981), *cert. denied,* 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982).

**4.** In *White Mountain,* 448 U.S. at 142–43, 100 S.Ct. at 2583, the Court explained that there are two doctrines that may render state law inapplicable to reservation Indians. The state may not act if the field it wishes to regulate has been "preempted," as to an Indian tribe, by federal treaties, statutes, or regulations, *or* if the state action would infringe upon the Indians' inherent rights of limited self-government. "The two barriers are independent." *See, also McClanahan,* 411 U.S. at 172, 93 S.Ct. at 1262 ("the trend has been away from the idea of

inherent sovereignty as a bar to state jurisdiction and towards reliance on federal pre-emption"); Note, *Indian Law—State Jurisdiction on Indian Reservations,* 3 W. New Eng.L.Rev. 715, 719–23 (1981). Thus, in *Moe v. Confederated Salish and Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), *Warren Trading Post Co. v. Arizona Tax Commission,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965), *White Mountain,* and *McClanahan,* state taxes were held inapplicable to various reservation Indians or activities because they were preempted by, or were inconsistent with, federal laws governing Indian economic activity.

**5.** *See* 25 U.S.C. § 1721(a)(9) (finding of Congress that from 1820 until the passage of the federal act it was the State of Maine rather than the United States that provided services to, asserted jurisdiction over, and assumed responsibility for the Penobscot Nation).

not to try nonmembers for the same acts, *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978). Tribal sovereignty permits the regulation of hunting and fishing by non-Indians on land owned by (or held in trust for) the tribe, but not the regulation of hunting and fishing on land owned by others, even if the land lies within the borders of a reservation. *Montana,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493. These cases involve matters that may be classified "domestic" in the sense that they involve only intra-tribal relationships or regulation of Indian-owned land. *See also* Goldberg, *A Dynamic View of Tribal Jurisdiction to Tax Non-Indians,* 40 Law & Contemp.Probs. 166, 169 (1976) ("Early decisions of the United States Supreme Court proclaimed that Indians possessed all sovereign powers over domestic matters within their territorial boundaries"). Recently, the Court has appeared to extend the scope of a tribe's inherent powers beyond these domestic matters, by holding that Indian tribes have some inherent power to tax.

*Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), involved the state's attempt to impose its general cigarette excise tax and sales tax to cigarette sales made by reservation Indians, on the reservation, to non-Indians. The tribes themselves had adopted an ordinance imposing their own tax on reservation cigarette sales. The Court upheld both taxes, agreeing with the Indians that "the power to tax transactions occurring on trust lands and significantly involving a tribe or its members is a fundamental attribute of sovereignty," 447 U.S. at 152, 100 S.Ct. at 2081, but rejecting the Indians' contention that the state taxes are "inconsistent with the principle of tribal self-government" and therefore invalid as applied on the reservation. *Id.* at 154, 100 S.Ct. at 2082. The Court held that

> Washington does not infringe the rights of reservation Indians to "make their own laws and be ruled by them" ... merely because the result of imposing

taxes will be to deprive the Tribes of revenues which they currently are receiving. The principle of tribal self-government, grounded in notions of inherent sovereignty and in congressional policies, seeks an accommodation between the interests of the tribes and the Federal Government, on the one hand, and those of the State, on the other.... While the Tribes do have an interest in raising revenues for essential government programs, that interest is strongest when revenues are derived from value generated on the reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal services.

*Id.* at 156–57, 100 S.Ct. at 2083. Moreover, said the Court, the state taxes did not conflict with or undermine any policy behind the tribal taxes, which had no "nonrevenue purposes"; the state taxes therefore did not "contravene the principle of tribal self-government." *Id.* at 158, 100 S.Ct. at 2084.

Most recently, in *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 137, 102 S.Ct. 894, 901, 71 L.Ed.2d 21 (1982), a tribe's tax on oil and gas produced on the reservation was upheld:

> The power to tax is an essential attribute of Indian sovereignty because it is a necessary instrument of self-government and territorial management. This power enables a tribal government to raise revenues for its essential services.... [I]t derives from the tribe's general authority, as a sovereign, to control economic activity within its jurisdiction, and to defray the cost of providing government services by requiring contributions from persons or enterprises engaged in economic activities within that jurisdiction.

None of these precedents directly controls the case at bar. No case has squarely addressed the question whether an Indian tribe may operate and profit from a commercial enterprise prohibited by generally applicable state law. *Jicarilla* and *Colville,* however, provide us with a good base from which to reason. Taxation of non-Indians

who do business on the reservation, though it goes beyond the direct regulation of relations among Indians or management of tribal resources, is included within a tribe's inherent powers primarily because it is considered "necessary" to finance the tribe's governmental activities and services. The Penobscot Nation, naturally, argues that its beano game functions to fulfill the same goal—to finance essential tribal services and programs. However, the Nation's case is weaker than that of the Indians in the tax cases, for at least three reasons. First, the Penobscots' beano revenues are not "derived from value generated on the reservation by activities involving the Tribe [where] the taxpayer is the recipient of tribal services." *Colville,* 447 U.S. at 156–57, 100 S.Ct. at 2083. The Colville Indians were in a weaker position than the Jicarilla Apaches, in the eyes of the Court, because "the value marketed by the [Colvilles'] smokeshops to persons coming from outside is not generated on the reservation by activities in which the Tribes have a significant interest," 447 U.S. at 155, 100 S.Ct. at 2082, whereas the taxpayers in *Jicarilla* both benefited from tribal services and depleted the natural resources of tribal land. Non-Indian beano players benefit from none of the services that the Penobscots' beano revenues support. Nor do they, when buying beano tickets, "purchase" any Indian resource—such as the right to exploit tribal lands for mineral wealth.

The second difference between the present case and the tax cases is related to this economic value discussion. While a tax regulates or adds to the cost of some independent or underlying economic activity, a beano game is its own *raison d'etre.* Revenue-raising through beano is thus very different from revenue-raising through taxation. Beano is a commercial operation, related to tribal self-government only because of the use to which its profits are put. It shares with taxation none of the regulatory or user charge theories that have historically made taxation an intrinsically governmental function. If the Penobscots' beano game is within their "sovereign" powers,

then Indian tribes must have the inherent authority to enter into all spheres of activity from which a profit could be made: everything from selling dry goods to selling drugs could become an aspect of tribal self-government by the tribe's committing the revenues raised to defraying the expense of the legitimate governmental function of the tribe.

■ The prospect, even though unlikely, of Indian tribes' claiming the inherent authority to engage in profitable but unlawful activities brings us to the third difference between our case and the tax cases. In *Colville* and *Jicarilla,* state laws did not forbid the tribes' actions. Maine, however, both punishes gambling criminally and forbids the operation of beano games for profit. The Supreme Court has acknowledged that the interests of the state must be a part of the calculus where an Indian tribe's "inherent" rights are under consideration. *Colville,* 447 U.S. at 156, 100 S.Ct. at 2082–83. Maine has a legitimate governmental interest—having nothing to do with its own financial needs—in preventing the Penobscot Nation's beano games. The tribe's interest in beano, by contrast, is purely financial. And in point of fact, the Penobscots would have nothing to "sell" if highstakes beano were not prohibited throughout the rest of Maine. The *Colville* Court allowed the State of Washington to apply its sales and cigarette taxes to on-reservation transactions because the Indian tribes had no inherent right "to market an exemption from state taxation." 447 U.S. at 155, 100 S.Ct. at 2082. The Penobscot Nation, in our view, has even less right "to market an exemption" from state gambling laws. *See* Note, *In Defense of Tribal Sovereign Immunity,* 95 Harv.L.Rev. 1058, 1068 (1982) ("the Court may be willing to limit the immunity given to tribes when they act commercially").

The Nation argues that the state's beano law is merely regulatory—designed to prevent crooked games—rather than prohibitory, and that, since there has been no sug-

gestion that the Penobscots' game is dishonest, the state has no interest in preventing it from continuing. History, however, shows that the Nation's premise is fallacious. Even though gambling may be currently looked upon with growing tolerance, such activity was unlawful under the common law of Maine long before the legislature enacted its anti-gambling statutes, *see Lewis v. Littlefield,* 15 Me. (3 Shep.) 233, 237 (1829) ("All wagers in this State [are] unlawful"); and both the common law and statutory prohibitions have grown out of a widely held belief that gambling is an evil from which the people must be protected. *See Phalen v. Virginia,* 49 U.S. (8 How.) 163, 168, 12 L.Ed. 1030 (1850), *quoted in Maine State Raceways v. LaFleur,* 147 Me. 367, 372, 87 A.2d 674, 677 (1952) (a lottery "infests the whole community; it enters every dwelling; it reaches every class; it preys upon the hard earnings of the poor; it plunders the ignorant and simple"). Even if we accepted the Nation's premise that Maine wishes only to regulate gambling and not to prohibit it, we would reject its conclusion. A motorist may not run a red light simply because no one else is entering the controlled intersection. Just so, an organization running a beano game may not thwart the state's licensing law just because that organization is not shown to have inflicted upon the public an evil that the law seeks generally to prevent.

■ For these reasons, we believe that the power to tax, recognized in *Colville* and *Jicarilla,* is a narrow exception to the general rule limiting an Indian tribe's inherent authority to regulate "domestic" matters, and that the Penobscot Nation's beano game does not fall within that exception. Under federal Indian common law, therefore, we would hold that the State of Maine may enforce 17 M.R.S.A. ch. 13–A against the Penobscot Nation.

### B. *Statutory Interpretation*

■ Ever since *Worcester v. Georgia,* 31 U.S. (6 Pet.) at 559, it has been recognized that the powers and authority of an Indian tribe or nation may be either expanded or limited by an act of Congress. *See also Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978) (tribal sovereignty is "subject to the superior and plenary control of Congress"); *Wheeler,* 435 U.S. at 323, 98 S.Ct. at 1086 (tribal sovereignty "exists only at the sufferance of Congress and is subject to complete defeasance"). In the case at bar, the federal government took no steps to alter or affect the status of the Penobscot Nation from the founding of the Republic until 1980. In fact, because of the dearth of federal contract with Maine Indians and their long and intricate historical relationship with the State of Maine, it was long doubted whether they constituted "bona fide tribes" under federal Indian law. *See Bottomly v. Passamaquoddy Tribe,* 599 F.2d 1061, 1063–65 (1st Cir.1979); *Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 388 F.Supp. 649 (D.Me.), *aff'd,* 528 F.2d 370 (1st Cir.1975); *State v. Dana,* 404 A.2d 551 (Me.1979), *cert. denied,* 444 U.S. 1098, 100 S.Ct. 1064, 62 L.Ed.2d 785 (1980). In 1980, Congress acted to settle far-reaching claims of various Maine Indians, including the Penobscots, to substantial money damages and to land comprising approximately two thirds of the state's territory. The federal settlement act, 25 U.S.C. §§ 1721–1735 (Supp. IV 1980), was predicated upon state legislation addressing the same topic, 30 M.R.S.A. §§ 6201–6214 (Supp.1982–83), which Congress expressly "approved, ratified, and confirmed." 25 U.S.C. §§ 1721(b)(3), 1725(b)(1). In addition to settling the land dispute,[6] these two acts quite precisely laid out the relationship thenceforth to obtain between the Penobscot Nation and the State of Maine. It is to these two statutes, therefore, that we turn

---

**6.** In the settlement, the Penobscot Nation became the beneficiary of two federal trust funds: (1) the Penobscot Land Acquisition Fund ($26,-800,000) for buying land for the Nation; and (2) the Penobscots' Maine Indian Claims Settlement Fund ($13,500,000), from which the income is paid quarterly to the Nation. *See* 25 U.S.C. § 1724(a)–(d).

to determine whether the Nation is now permitted to run an otherwise unlawful beano game on its reservation.

Section 1725(b)(1) of the federal act states that the Penobscot Nation, its members, and all lands and natural resources owned or held in trust for the Nation or its members, "shall be subject to the jurisdiction of the State of Maine to the extent and in the manner provided in the Maine Implementing Act." By the same token, section 1725(f) authorizes the Nation "to exercise jurisdiction, separate and distinct from the civil and criminal jurisdiction of the State of Maine, to the extent authorized by the Maine Implementing Act." We are thus referred to the state act for an answer to the beano question. Two sections of the state act bear upon our inquiry. 30 M.R.S.A. § 6204 states:

> Except as otherwise provided in this Act, all Indians, Indian nations, and tribes and bands of Indians in the State and any lands or other natural resources owned by them, held in trust for them by the United States or by any other person or entity shall be subject to the laws of the State and to the civil and criminal jurisdiction of the courts of the State to the same extent as any other person or lands or other natural resources therein.

More specifically, section 6206(1) confers upon the Nation the status of a Maine municipality, with an exception for "internal tribal matters":

> Except as otherwise provided in this Act, the Passamaquoddy Tribe and the Penobscot Nation, within their respective Indian territories, shall have, exercise and enjoy all the rights, privileges, powers and immunities, including, but without limitation, the power to enact ordinances and collect taxes, and shall be subject to all the duties, obligations, liabilities and limitations of a municipality of and subject to the laws of the State, *provided, however, that internal tribal matters, in-cluding membership in the respective tribe or nation, the right to reside within the respective Indian territories, tribal organization, tribal government, tribal elections and the use or disposition of settlement fund income shall not be subject to regulation by the State.*

(Emphasis added).

Put as narrowly as possible, then, the issue here boils down to whether the Penobscot Nation's beano game is an "internal tribal matter." In answering this question, in the negative, we first dispose of the contention that any matter over which an Indian tribe would have inherent authority under federal common law is an "internal tribal matter" under section 6206(1).

For one thing, section 1725(h) of the federal act makes "the laws and regulations of the United States which are generally applicable to Indians" inapplicable to the Nation insofar as any of such federal laws or regulations "affects or preempts the civil, criminal, or regulatory jurisdiction of the State of Maine." We read the term "laws" to include case law. *Cf.* 25 U.S.C. § 1722(d) ("laws of the State" includes Maine common law). It would make no sense, in an integrated legislative package, to define the state's jurisdiction with reference to federal case law, while at the same time declaring that the self-same case law has no impact upon the jurisdiction of the state of Maine.

For another thing, the legislative history of both acts makes it clear that they were intended to *change* the relationship between tribal and state authority from what it had been up until 1980. Counsel for the Nation said as much in public hearings before a state legislative committee:

> In the end what we wound up with was a blueprint for a governmental relationship between Indians and non-Indians alike— unlike that which exists anywhere else in the United States.[7]

---

7. The Penobscot Nation's counsel acknowledged that the expansion of the State's jurisdiction over the Maine Indian tribes from what he conceived it previously to be was part of the *quid pro quo* for the State's going along with the settlement, which was necessary for the

Transcript of March 28, 1980 Public Hearing before the Joint Select Committee on Indian Land Claims, 25 (1980). While there was some disagreement as to whether the acts would limit or expand tribal powers, *compare* H.Rep. No. 96–1353, 96th Cong., 2d Sess. 15 (1980) U.S.Code Cong. & Admin. News, p. 3786 ("the settlement strengthens the sovereignty of the Maine tribes"), *with* Legis.Rec. 721 (1980) (statement of Sen. Conley: "If this legislation passes, it becomes unique in . . . that this will be the only State in the Union that does not have a nation within a nation, that all Indians are subjected to Maine law"), this disagreement stemmed primarily from the fact that the various legislators held differing views as to the extent of the tribes' powers before the settlement. It was generally agreed that the acts set up a relationship between the tribes, the state, and the federal government different from the relationship of Indians in other states to the state and federal governments.

Finally, we note that the phrase "internal tribal matters" is not a legal term of art. One would be rash to equate this phrase with such terms as "internal and social relations," *United States v. Kagama,* 118 U.S. at 381, 6 S.Ct. at 1109, "internal affairs," *Williams v. Lee,* 358 U.S. at 221, 79 S.Ct. at 271, or "tribal self-government," *McClanahan v. Arizona State Tax Commission,* 411 U.S. at 179, 93 S.Ct. at 1266, merely because of a partial language overlap.

 We, therefore, look not to federal common law to define "internal tribal matters," but to the statute itself and to its legislative history. The state act follows the term "internal tribal matters" with a list of those matters included in the term: "membership in the respective tribe or na-

tion, the right to reside within the respective Indian territories, tribal organization, tribal government, tribal elections and the use or disposition of settlement fund income." 30 M.R.S.A. § 6206(1). Although this list is not exclusive, it cannot be denied that all of the items in it are fundamentally unlike the operation of an otherwise unlawful beano game. By the very nature of the matters listed, action by the Nation *directly* affecting them would not tend to bring the Nation into conflict with state laws of general application. By the familiar *ejusdem generis* rule, a general term followed by a list of illustrations is ordinarily assumed to embrace only concepts similar to those illustrations. *Brunswick School Board v. Califano,* 449 F.Supp. 866, 870 (D.Me.1978), *aff'd sub nom., Isleboro School Committee v. Califano,* 593 F.2d 424 (1st Cir.), *cert. denied,* 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 387 (1979). *See also Harrison v. PPG Industries, Inc.,* 446 U.S. 578, 588, 100 S.Ct. 1889, 1895, 64 L.Ed.2d 525 (1980). We construe section 6206(1) in accordance with this principle and find that beano is not embraced within the general term. The Nation argues that its beano games are related to "tribal government" because their proceeds help finance that government and its activities. We must reject this argument. As the Superior Court wrote, the exception so interpreted "would virtually nullify state jurisdiction," although section 6204 makes state jurisdiction the rule for the Penobscot Nation. If beano is an "internal tribal matter" and exempt from state regulation because of the uses to which its income is put, the same logic would make a myriad of other forbidden and even criminal practices legal so long as they turned a profit for the Nation. This

---

Nation to get the monetary benefits provided it by the settlement. He said:

> In light of all this, one might ask why the Indians were willing to even discuss the question of jurisdiction with the State but simply the answer is that they were obliged to do so if they wanted to effectuate the Settlement of the monetary and land aspects of the claim. . . . [T]he Tribes opened negoti-

ation with the State concerning the question of jurisdiction not because they wanted to do so but because they were obliged to do so to obtain a settlement that they had already negotiated with the federal government.

Transcript of March 28, 1980 Public Hearing before the Joint Select Committee on Indian Land Claims, 23–24 (1980).

result would violate the overall spirit of the settlement acts as well as common sense.

We note also that section 6206(1) of the Maine act explicitly authorizes the Nation to collect taxes. This grant would be unnecessary if, as the Nation argues, governmental financing mechanisms automatically fall within the Nation's scope of authority under the "internal tribal affairs" rubric.

Finally, the acts' legislative history supports our *ejusdem generis* construction of the term "internal tribal matters"—that is, our conclusion that the term embraces only those matters illustratively listed in the statute and other matters like them.

At the time the settlement acts were under consideration, the Attorney General of the State of Maine understood the "internal tribal affairs" exception to have been drafted "in recognition of [the Indians'] unique cultural or historical interest." S.Rep. No. 96–957, 96th Cong., 2d Sess. 50 (1980). The House Report stated that the settlement acts would protect the Indians against "acculturation" "by providing for tribal governments ... which control all such internal matters." H.Rep. No. 96–1353, 96th Cong., 2d Sess. 17 (1980), U.S. Code Cong. & Admin.News, p. 3793. Counsel to the Penobscot Nation told a Maine legislative committee that he understood the settlement acts to accommodate "the Tribe's legitimate interest in managing their internal affairs, in exercising tribal powers in certain areas of particular cultural importance ...." Transcript of March 28, 1980 Public Hearing before the Joint Select Committee on Indian Land Claims, 25 (1980). And the committee itself reported that the exception to full state jurisdiction over Indians was provided "in recognition of traditional Indian practices." Report of the Joint Select Committee on Indian Land Claims 1 (1980). *See also* Transcript of March 28, 1980 Public Hearing before the Joint Select Committee on Indian Land Claims, 7 (statement of Sen. Collins: "there are some exceptions [to full state jurisdiction] which recognize historical Indian concerns").

Beano has played no part in the Penobscot Nation's historical culture or development. It is not uniquely Indian in character. It is not a traditional Indian practice and has no particular cultural importance for the Nation. Its only relationship to the Nation's "internal tribal matters" consists in the fact that the games' proceeds are used to finance admittedly legitimate tribal services and programs. This link is not strong enough to shield the games from the enforcement of 17 M.R.S.A. ch. 13–A on the Penobscot reservation.

The entry is:

Judgment affirmed.

All concurring.