2008 ME 184

**Pamela F. FRANCIS**

v.

**Colleen DANA–CUMMINGS et al.**

Supreme Judicial Court of Maine.

Argued: Oct. 22, 2008.
Decided: Dec. 11, 2008.

Curtis Webber, Esq. (orally), Linnell, Choate & Webber, LLP, Auburn, ME, for Pamela Francis.

William H. Dale, Esq., Jensen Baird Gardner & Henry; Kaighn Smith, Jr., Esq. (orally), DrummondWoodsum, Portland, ME, for the Tribal Defendants.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, and SILVER, JJ.

ALEXANDER, J.

[¶ 1] Pamela F. Francis appeals from a summary judgment entered in the Superior Court (Washington County, *Hunter, J.*) in favor of Colleen Dana–Cummings, the Passamaquoddy Tribe (the Tribe), the Pleasant Point Passamaquoddy Housing Authority (PHA), and five of the PHA's commissioners (collectively, the Tribal Defendants). Francis contends that the Superior Court erred in ruling that: (1) the Tribal Court, sitting without a jury, has exclusive jurisdiction pursuant to 30 M.R.S. § 6206(1) (2007) to hear her claims against the PHA and the individually-named defendants;[1] (2) the court did not have jurisdiction to hear her claims and allow her a jury trial pursuant to the Maine Civil Rights Act, 5 M.R.S. §§ 681–4685 (2007) and the Maine Constitution; and (3) this case is not governed by the provision of the Tribe's Constitution stat-ing that tribal law will not apply when it conflicts with State laws. We affirm.

## I. CASE HISTORY

[¶ 2] The issues before us arise out of three separate lawsuits, two of which were consolidated, that Pamela F. Francis filed in the Superior Court against the PHA; the PHA's former Executive Director, Colleen Dana–Cummings; and five individually-named PHA commissioners. All individual parties are members of the Passamaquoddy Tribe.

[¶ 3] On or about February 24, 1998, while Francis was residing in Old Orchard Beach, representatives of the PHA forcibly entered and took possession of a residence, Unit 25, that Francis had formerly occupied on the Passamaquoddy Reservation at Pleasant Point. Francis asserts that the residence was her private property, acquired as the successor to her father's interest as the lease-purchaser, and that she suffered the loss of household items and other damages as a result of the entry into her residence.

[¶ 4] Francis first filed a four-count complaint in 2002 against the PHA in the Passamaquoddy Tribal Court, based on the same facts as in the case before the Superior Court, alleging violations of the Tribe's Fair Housing Code, damages due to trespass, unlawful entry, and illegal possession of personal property. The PHA filed a counterclaim, seeking to quiet title to the property and alleging that Francis never had legal rights to the residence at issue and that her occupation of the unit

---

1. Title 30 M.R.S. § 6206(1) (2007), part of the Maine Implementing Act, 30 M.R.S. §§ 6201–6214 (2007), provides in relevant part:

 Except as otherwise provided in this Act, the Passamaquoddy Tribe and the Penobscot Nation, within their respective Indian territories, shall have, exercise and enjoy all the rights, privileges, powers and immunities ... of a municipality of and subject to the laws of the State, provided, however, that internal tribal matters, including membership in the respective tribe or nation, the right to reside within the respective Indian territories, tribal organization, tribal government, tribal elections and the use or disposition of settlement fund income shall not be subject to regulation by the State.

violated applicable U.S. Department of Housing and Urban Development and PHA regulations, policies and procedures, resulting in trespass. Francis subsequently filed the actions in Superior Court against the Tribal Defendants, seeking damages and alleging illegal eviction, trespass, and civil rights violations. The Superior Court actions are subject to the appeal now before us.

[¶ 5] We have previously considered several appeals in Francis's state court claims against the Tribal Defendants. The lengthy history of the cases is reviewed in our opinion in *Francis v. Dana–Cummings (Francis IV)*, 2007 ME 16, 915 A.2d 412. Except for reference to events that occurred since our remand in *Francis IV*, that history is not repeated here.

[¶ 6] In *Francis IV*, we remanded the case to the Superior Court with instructions to allow the Tribe to intervene as a defendant. *Id.* ¶ 24, 915 A.2d at 417. Additionally, clarifying that any party, not just the Tribe itself, "may assert that a court of the State lacks jurisdiction over a particular claim," we remanded the case to the court to determine whether Francis's claims involve any "'internal tribal matters' not subject to state regulation and thus, not subject to the jurisdiction of the Superior Court" pursuant to section 6206(1). *Id.* ¶¶ 21–22, 915 A.2d at 416–17.

[¶ 7] On remand, the Tribe filed motions to dismiss and for summary judgment. The individual defendants filed nearly identical motions for summary judgment, as did the Tribe and the PHA in Francis's separate case against the PHA.

[¶ 8] After our remand in *Francis IV*, but before the Superior Court acted on the Tribal Defendants' motions, the Tribal Court (Pleasant Point Division, *Irving, J.*)

tried Francis's claim against the PHA. The Tribal Court entered a judgment for Francis, finding that Francis's father's agreement with the PHA to lease-purchase Unit 25 was valid and that Francis was the successor-in-interest to the residence under the agreement following her father's death. The Tribal Court concluded that the PHA violated the Tribe's Fair Housing Code and, thus, Francis's rights as a tenant/homebuyer. The court awarded Francis $10,461.75 in compensatory and emotional distress damages and ordered the PHA to deliver the deed to Unit 25 to Francis upon her payment of the $3048.60 balance due on the home. The Tribal Court held that punitive damages were not available because the PHA is a governmental entity immune from such damages. The PHA is appealing the judgment to the Appellate Division of the Tribal Court, as is Francis who asserts that the Tribal Court erred in denying her request for attorney fees.

[¶ 9] Shortly after the Tribal Court issued its judgment, the Superior Court granted summary judgments in favor of the Tribal Defendants. The court concluded that there were no genuine issues of material fact and that, as a matter of law, the issues, "sounding as [they do] in basic issues of housing on the Tribal reservation," involve "an internal tribal matter." Accordingly, the court concluded that state courts lack subject matter jurisdiction over Francis's claims pursuant to section 6206(1).[2] Francis appeals the court's grant of summary judgments.

## II. LEGAL ANALYSIS

■ [¶ 10] We review a summary judgment de novo, considering the evi-

---

**2.** As we suggested in *Francis v. Dana–Cummings (Francis IV)*, 2007 ME 16, ¶ 25, 915 A.2d 412, 417, the trial court also considered whether Francis's claims against the PHA and the individual defendants have an affirmative defense from suit under the Maine Tort Claims Act, 14 M.R.S. §§ 8101–8118 (2007), but did not reach the merits of the issue.

dence in the light most favorable to the party against whom judgment was entered, to determine whether the parties' statements of material facts and the record evidence referenced therein indicate that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. *Dyer v. Dep't of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821, 825.

 [¶ 11] We also review the interpretation of a statute de novo and accord the words of the statute their plain, ordinary meaning. *Maddocks v. Whitcomb*, 2006 ME 47, ¶ 4, 896 A.2d 265, 267. "Statutory schemes must be interpreted as a whole to avoid inconsistent results." *Boyer v. Boyer*, 1999 ME 128, ¶ 14, 736 A.2d 273, 278.

 [¶ 12] The central issue on appeal is whether, as a matter of law, Francis's claims involve internal tribal matters, thus barring a state court from exercising subject matter jurisdiction over them. The statute central to this appeal, section 6206(1) of the Maine Implementing Act, provides in relevant part:

> Except as otherwise provided in this Act, the Passamaquoddy Tribe and the Penobscot Nation, within their respective Indian territories, shall have, exercise and enjoy all the rights, privileges, powers and immunities ... of a municipality of and subject to the laws of the State, provided, however, that *internal tribal matters,* including membership in the respective tribe or nation, the right to reside within the respective Indian territories, tribal organization, tribal government, tribal elections and the use or disposition of settlement fund income *shall not be subject to regulation by the State.*

30 M.R.S. § 6206(1) (emphasis added). Thus, despite the otherwise broad grant of jurisdiction to state courts with respect to the Passamaquoddy Tribe and Penobscot

Nation, *see, e.g.,* 30 M.R.S. §§ 6204, 6206(2) (2007), a state court has no subject matter jurisdiction over internal tribal matters. *See State of Maine v. Johnson,* 498 F.3d 37, 46 (1st Cir.2007); *Penobscot Nation v. Stilphen,* 461 A.2d 478, 488–90 (Me.1983).

[¶ 13] Section 6206(1) does not define "internal tribal matters" over which state courts have no subject matter jurisdiction, instead stating that internal tribal matters include, in a non-exhaustive list: "membership in the respective tribe or nation, the right to reside within the respective Indian territories, tribal organization, tribal government, tribal elections and the use or disposition of settlement fund income." 30 M.R.S. § 6206(1). Although Francis's claims involve her right to possession or ownership of a residence on tribal land, they do not involve her right to reside within the Tribe's territory, which has been undisputed.

[¶ 14] Because Francis's claims do not fit squarely within any of the examples of "internal tribal matters" listed in section 6206(1), we look to case law to address this issue. We have previously analyzed whether an issue involves an "internal tribal matter" in two opinions, *Stilphen* and *Great Northern Paper, Inc. v. Penobscot Nation,* 2001 ME 68, 770 A.2d 574, and we addressed the issue in *Francis IV.*

[¶ 15] In *Stilphen,* we considered whether the Tribe's provision of beano games to the public, in violation of state law, was an "internal tribal matter" within the meaning of section 6206(1). 461 A.2d at 488. Because offering beano games is not one of the internal tribal matters listed in section 6206(1), we applied the *ejusdem generis* rule that "a general term followed by a list of illustrations is ordinarily assumed to embrace only concepts similar to those illustrations" to determine whether the Tribe's provision of beano games was

of a nature sufficiently similar to the listed examples of "internal tribal matters" to also constitute an internal tribal matter. *Id.* at 489. We analyzed the list of "internal tribal matters," looking also to the legislative history of the Maine Implementing Act and of the federal Settlement Act, 25 U.S.C.S. §§ 1721–1735 (2004 & Supp.2008), which ratified the Implementing Act. *Id.* at 488–90.[3] We concluded that matters involving "internal tribal matters" would generally include matters concerning "action by the Nation *directly* affecting them" and matters concerning "the Penobscot Nation's historical culture or development." *Id* at 489–90. Applying this interpretation of what constitutes "internal tribal matters," we held that the Penobscot Nation's operation of beano games was "fundamentally unlike" the listed internal tribal matters, was "not embraced within the general term" of "internal tribal matters", and was, therefore, subject to enforcement under state law. *Id.*

[¶ 16] In *Great Northern Paper*, we did not discuss the *ejusdem generis* approach taken in *Stilphen*. Instead, we adopted the non-exclusive, non-dispositive factors described in *Akins v. Penobscot Nation*, 130 F.3d 482, 486–87 (1st Cir.1997), and we reviewed legislative history,[4] to aid in de-termining whether the disputed issue related to an internal tribal matter. *Great N. Paper*, 2001 ME 68, ¶ 48–50, 60, 770 A.2d at 588–89, 591 (holding that the Maine Freedom of Access Act does not apply, pursuant to section 6206(1), to the Tribe's internal conduct of their government, but does apply when the Tribe communicates and interacts with other governments). The factors applied in *Great Northern Paper* were: (1) the effect on nontribal members including members of the public outside of tribal lands; (2) the subject matter of the dispute, particularly when related to Indian lands or the harvesting of natural resources on Indian lands, (3) the interests of the State of Maine, and (4) prior legal understandings. *Id.* ¶¶ 49, 55–56, 770 A.2d at 589–90; *see also Penobscot Nation v. Fellencer*, 164 F.3d 706, 709–13 (1st Cir.1999) (applying the *Akins* factors, and adding as a factor the nature of the employment position at issue, to conclude that Fellencer's claim against the Nation for unlawful termination of employment as a community nurse involved an "internal tribal matter" over which the Tribal Court had exclusive jurisdiction, even though Fellencer was not a member of the Nation); *Akins*, 130 F.3d at 487–88, 490 (concluding that no claim

---

3. The *Stilphen* Court noted that, at the time the Implementing and Settlement acts were under consideration, Maine's Attorney General "understood the 'internal tribal affairs' exception to have been drafted 'in recognition of [the Indians'] unique cultural or historical interest.'" *Penobscot Nation v. Stilphen*, 461 A.2d 478, 490 (Me.1983) (citing S.Rep. No. 96–957, at 50 (1980), 96th Cong. 2nd Sess. 1980). The Court also observed that the United States "House Report stated that the settlement acts would protect the Indians against 'acculturation' 'by providing for tribal governments ... which control all such internal matters.'" *Id.* (citing H.R.Rep. No. 96–1353, at 17 (1980), 96th Cong., 2d Sess. 17 (1980), 1980 U.S.Code Cong. & Admin.News, at 3793).

4. In *Great Northern Paper, Inc. v. Penobscot Nation*, 2001 ME 68, ¶ 48, 770 A.2d 574, 588 (citing H.R.Rep. No. 96–1353, 96th Cong. 2nd Sess. (1980), 1980 U.S.Code Cong. & Admin.News 3786), we noted that the legislative history to the federal Settlement Act provided:

 Prior to the settlement, the State passed laws governing the internal affairs of the Passamaquoddy Tribe and the Penobscot Nation, and claimed the power to change these laws or even terminate these tribes .... While the settlement represents a compromise in which state authority is extended over Indian territory to the extent provided in the Maine Implementing Act ... the settlement provides that henceforth the Tribes will be free from state interference in the exercise of their internal affairs.

was stated under federal or Maine law because the Penobscot Nation's regulation of stumpage permits was an "internal tribal matter" within the meaning of section 6206(1) where the permit policy affected only tribal members and natural resources within tribal territories).

[¶ 17] Applying these factors, we concluded in *Great Northern Paper* that:

> [A] Tribe's own methods of convening and engaging in government will in most instances be matters "internal" to the Tribe. The methods by which the Tribes govern themselves are not matters of interest to the citizenry of the state at large. Tribal government will ordinarily be focused on Indian territory, tribal resources, and members of the Tribe. Moreover, treating the processes of tribal government as free from state interference is entirely consistent with the intent of the settlement acts.

2001 ME 68, ¶ 50, 770 A.2d at 589 (internal citations omitted). We indicated that, though tribal efforts that have a direct impact on non-tribal members may not constitute "internal tribal matters," not all actions affecting non-Indians would necessarily fall outside of the definition of "internal tribal matters." *Id.* ¶¶ 54–56 n. 19, 770 A.2d at 589–90.

[¶ 18] In *Francis IV*, we instructed the trial court to make factual findings to determine: (1) whether the dispute is between tribal members; and (2) who has ownership or possessory rights to the property in dispute and, if unclear, whether that question is resolved by the application and interpretation of tribal law. 2007 ME 16, ¶ 22, 915 A.2d at 417.

[¶ 19] With the guidance of this history, particularly referencing the factors to consider in determining if a disputed issue relates to an internal tribal matter listed in *Great Northern Paper, Fellencer* and *Akins,* we look to the facts of this case.

[¶ 20] Here, the record establishes, without dispute, that:

1. All of the individual parties are members of the Passamaquoddy Tribe.
2. The property involved in the dispute is a low-income housing unit located on the Pleasant Point Passamaquoddy Reservation on land owned by the Tribe.
3. The dispute involved occupancy and rights to use property on the reservation.
4. All questioned actions occurred on the reservation and involved only members of the Tribe and agencies controlled by the Tribes.[5]
5. A forum to redress any violation of rights and provide remedies exists in the Tribal Court.
6. This dispute can be resolved without participation by or communication with parties or agencies outside of the reservation community.
7. Resolution of this dispute requires the interpretation and application of tribal law, regulations, rules, and policies.

[¶ 21] Judged against the criteria discussed in *Great Northern Paper, Fellencer,* and *Akins,* and as the Superior Court determined, these factors demonstrate that the dispute here is an internal tribal matter over which the Tribe and the Tribal Court have exclusive jurisdiction, not "sub-

---

**5.** We have previously held that the PHA is a "quasi-municipal corporation, separate and independent from the Tribe." *See Francis IV,* 2007 ME 16, ¶ 23, 915 A.2d at 417. However, the undisputed facts show that the PHA is governed by a Commission consisting of five commissioners who are appointed by the Tribe and who appoint the PHA's executive director. The PHA is the Tribe's federally-recognized representative for purposes of administering the Tribe's housing program pursuant to the Native American Housing Assistance and Self–Determination Act of 1996, 25 U.S.C.A. §§ 4101–4243 (2004 & Supp.2008).

ject to regulation by the State" pursuant to 30 M.R.S. § 6206(1).[6]

[¶ 22] Francis argues that she must have access to State court remedies because the PHA was the only defendant in her Tribal Court litigation and because a jury trial, attorney fees, punitive damages, and the capacity to seek relief pursuant to the Maine Civil Rights Act (MCRA) were not available to her in Tribal Court. If such were the case, any claim involving an internal tribal matter could be shifted to State court by the simple device of pleading an entitlement to a remedy not available in Tribal Court.

■ [¶ 23] The important policies of the law to support tribal self-government over internal tribal matters limits claims involving such matters where, as here, some remedy and a forum to assert entitlement to the remedy is available within the Tribe. See Fellencer, 164 F.3d at 707, 713 (holding that the Nation's decision to terminate Fellencer's employment was an "internal tribal matter" within the meaning of section 6206(1) over which state courts lacked jurisdiction, notwithstanding the fact that its decision foreclosed Fellencer's ability to pursue a claim under the Maine Human Rights Act over which, like MCRA claims, Maine Superior Courts have exclusive jurisdiction); see also Akins, 130 F.3d at 485, 486 n. 5. Finally, contrary to Francis's contention, the Tribe's Constitution is in accord with the result of this case.

The entry is:

Judgment affirmed.

---

**6.** In reaching this conclusion, we do not suggest that all seven factors we list must always be present for a matter to be an internal tribal matter. Such must be determined on a case-by-case basis. The seven factors listed here demonstrate the strength of the view that this matter is an internal tribal matter.