Andrew **AKINS, et al., Plaintiffs, Appellants,**

v.

**PENOBSCOT NATION, et al., Defendants, Appellees.**

No. 97–1644.

United States Court of Appeals, First Circuit.

Heard Oct. 8, 1997.

Decided Nov. 17, 1997.

Before TORRUELLA, Chief Judge, LYNCH, Circuit Judge,and STEARNS,* District Judge.

**LYNCH, Circuit Judge.**

This case presents the first instance this court has been asked to address an important question in the allocation of sovereign powers between the Penobscot Nation and the State of Maine: the definition of "internal tribal matters." If the dispute here involves an "internal tribal matter" then the tribal courts have exclusive jurisdiction; if not, then claims have been stated within federal court jurisdiction and it was error to dismiss the action. While defining what constitutes an internal matter controlled by Indian tribes is hardly novel in Native American law, it is novel in this context. The relations between Maine and the Penobscot Nation are not governed by all of the usual laws governing such relationships, but by two unique laws, one Maine and one federal, approving a settlement. That settlement resulted from disputed claims for vast portions of lands in Maine brought by the Penobscots and others who had not historically been formally recognized as sovereign Indians.

I.

This case involves the harvesting of timber on those lands acquired by the Penobscot Nation as a result of the settlement agreement. Plaintiff Andrew X. Akins is the former Chairman of the Joint Tribal Negotiating Committee; he now resides in Alabama. Akins and his company, PENAK, Inc., also a plaintiff (whom we refer to jointly as "Akins") for several years logged portions of the land under stumpage permits issued by the Nation. In December of 1993, the Nation's Tribal Council voted a new policy: stumpage permits would be issued only to people who were both enrolled members of the Nation and residents of Maine. Akins is an enrolled member of the Nation, but not a Maine resident. Akins says he is the only tribal member who will be affected by the new policy. The policy became effective on

Timothy C. Woodcock, with whom Weatherbee, Woodcock, Burlock & Woodcock, Bangor, ME, was on brief, for Plaintiffs, Appellants.

Kaighn Smith, Portland, ME, for Defendants, Appellees.

* Of the District of Massachusetts, sitting by desig-

nation.

May 18, 1994 and the next day the Nation told Akins he was not eligible for a permit.

Akins sued the Nation and its Tribal Council in the U.S. District Court in Maine, under 42 U.S.C. §§ 1983 and 1985, alleging that singling him out through an ostensibly neutral policy violated his rights to due process, equal protection, and to be free from bills of attainder. He also brought state law claims and alleged diversity jurisdiction. A report of a Magistrate Judge recommended dismissal of the case for failure to state a claim for which relief may be granted and for lack of subject matter jurisdiction. The U.S. District Court accepted the recommendation and dismissed. Akins appeals, arguing: that the district court erred in holding that the stumpage policy is an "internal tribal matter;" that he has cognizable claims under 42 U.S.C. §§ 1983 and 1985, as well as the Declaratory Judgment Act, 28 U.S.C. § 2201–02; and that the stumpage policy violates the Maine Administrative Procedures Act and the Maine Constitution.

## II.

The issues in this case cannot be grasped without understanding the genesis of the Maine Indian Claims Settlement Act of 1980, 25 U.S.C. §§ 1721–35 (the "Settlement Act"). The history of the Settlement Act was brought to life in the decision of the Maine Law Court in *Penobscot Nation v. Stilphen,* 461 A.2d 478, 487 (Me.1983), and of this Circuit in *Passamaquoddy Tribe v. Maine,* 75 F.3d 784, 787 (1st Cir.1996). A summary of that history will do here.

The disputes which led to the settlement involved assertions that certain persons and groups were members of Indian tribes and as such entitled to ancestral lands and to monetary damages. The claimed lands amounted to nearly two-thirds of Maine's landmass. *See Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 388 F.Supp. 649, 651–53, 667–69 (D.Me.), *aff'd,* 528 F.2d 370 (1st Cir.1975). Under federal auspices, the Penobscot Nation, other claimants, and Maine negotiated a settlement. That settlement was subject to approval by both the Maine Legislature and Congress. Maine enacted the Implementing Act, Me.Rev.Stat. Ann. tit. 30 §§ 6201–14, which provides:

[T]he Passamaquoddy Tribe and the Penobscot Nation, within their respective Indian territories, shall have, exercise and enjoy all the rights, privileges, powers and immunities, including, but without limitation, the power to enact ordinances and collect taxes, and shall be subject to all the duties, obligations, liabilities and limitations of a municipality of and subject to the laws of the State, *provided however, that internal tribal matters, including membership in the respective tribe or nation, the right to reside within the respective Indian territories, tribal organization, tribal government, tribal elections and the use or disposition of settlement fund income shall not be subject to regulation by the State.*

Title 30, § 6206(1) (emphasis added). The Implementing Act was incorporated into the federal Settlement Act of 1980, 25 U.S.C. §§ 1721–35.

Each party benefitted from the settlement. The Nation in many respects gained the powers of a municipality under Maine law. "[T]he Settlement Act confirmed [the Nation's] title to designated reservation lands, memorialized federal recognition of its tribal status, and opened the floodgate for the influx of millions of dollars in federal subsidies." *Passamaquoddy Tribe,* 75 F.3d at 787. Maine, in turn, put to rest the land claims and achieved a certain sharing of authority with the Nation, as described below.

## III.

The structure of analysis differs here from that which would be used in claims against the vast majority of other Indian tribes in the country.[2] This is true as to the application of both state and federal law. As to state law, the Penobscot Nation and Maine expressly agreed that, with very limited exceptions, the Nation is subject to the laws of

---

**2.** The Narragansett tribe in Rhode Island is also governed by a Claims Settlement Act. *See* 25 U.S.C. §§ 1701–06 (1978); *Narragansett Indian Tribe v. Narragansett Elec. Co.,* 89 F.3d 908 (1st Cir.1996).

Maine. *See* 25 U.S.C. § 1725. Congress was explicit that the purpose of the Settlement Act was "to ratify the Maine Implementing Act, which defines the relationship between the State of Maine ... and the Penobscot Nation" and "to confirm that all other Indians ... are and shall be subject to the laws of the State of Maine, as provided herein." 25 U.S.C. § 1721(b)(3) & (4). The federal Settlement Act provides that:

> The ... Penobscot Nation, and [its] members, and the land and natural resources owned by, or held in trust for the benefit of the tribe, nation, or [its] members, shall be subject to the jurisdiction of the State of Maine to the extent and in the manner provided in the Maine Implementing Act and that Act is hereby approved, ratified, and confirmed.

25 U.S.C. § 1725(b)(1). In turn, the Settlement Act made federal law which was then generally applicable to Indians also applicable to the Penobscot Nation but declared special laws and regulations inapplicable. *See* 25 U.S.C. § 1725(h). The State of Maine may amend the Implementing Act to modify the jurisdictional powers of the Nation only if the Nation agrees to the amendment. *See* 25 U.S.C. § 1725(e)(1).

■ Although Indian tribes are not usually subject to the diversity jurisdiction of the federal courts, see *Romanella v. Hayward*, 114 F.3d 15 (2d Cir.1997), the Settlement Act subjects the Maine tribes to diversity jurisdiction:

> the Penobscot Nation ... may sue and be sued in the courts of the ... United States to the same extent as any other entity or person residing in the State of Maine may sue and be sued in [that] court.[3]

25 U.S.C. § 1725(d)(1). Further, those federal laws enacted after October 10, 1980 (the effective date of the Settlement Act) for the benefit of Indians do not apply within Maine unless the federal statute is made expressly applicable within Maine. 25 U.S.C. § 1735(b).

■ The Settlement Act provides at 25 U.S.C. § 1725(f):

> The ... Penobscot Nation [is] hereby authorized to exercise jurisdiction, separate and distinct from the civil and criminal jurisdiction of the State of Maine, to the extent authorized by the Maine Implementing Act, and any subsequent amendments thereto.

The Implementing Act in turn makes the Nation subject "to all the duties, obligations, liabilities and limitations of a municipality ... *provided, however, that internal tribal matters ... shall not be subject to regulation by the State.*" Me.Rev.Stat. Ann. tit. 30, § 6206(1) (emphasis added). The viability of both the federal law claims under § 1983 and the state law claims under diversity jurisdiction depend on whether the Implementing Act and the Settlement Act subject the Penobscot Nation's stumpage policy to regulation by the State. Put differently, the Nation in certain capacities functions as a municipality of Maine and is reachable under state and federal law in that capacity, but when it functions as a tribe as to internal tribal matters, it is not.

This case turns on whether the issuance of stumpage permits is an "internal tribal matter." Under the Settlement Act, we consider that to be a question of federal law, and the parties so agree.[4] If this is an internal tribal matter, then Akins's § 1983 claim fails because the Nation would not have been acting "under color of state law." *See R.J. Williams Co. v. Fort Belknap Hous. Auth.*, 719 F.2d 979, 982 (9th Cir.1983); *Dry Creek Lodge, Inc. v. United States*, 515 F.2d 926, 931 (10th Cir.1975). If this is an internal tribal matter, then under both Settlement Act and the Implementing Act, Maine law does not apply and no claims arise under the Maine Constitution or under the Maine Administrative Procedure Act. Thus no claim arises under state law warranting the exercise of diversity jurisdiction.

---

**3.** That section also provides certain immunities from suit. We do not reach the issue of immunity.

**4.** The Settlement Act at 25 U.S.C. § 1735(a) recites that in the event of any conflict between that Act and the Maine Implementing Act, the federal statute prevails.

## IV.

■ In considering Akins's § 1983 claim, we note that Congress did not exempt the Penobscot Nation from obligations not to trammel on civil rights. At a minimum it did so in a separate general statute, the Indian Civil Rights Act of 1968 ("ICRA"). *See* 25 U.S.C. §§ 1301–41, made applicable to the Penobscot Nation by 25 U.S.C. § 1725(h). The ICRA imposes "restrictions upon tribal governments similar, but not identical, to those embodied in the Bill of Rights and the Fourteenth Amendment." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 57, 98 S.Ct. 1670, 1676, 56 L.Ed.2d 106 (1978). Under the ICRA, "No Indian tribe in exercising powers of self-government shall ... deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law." 25 U.S.C. § 1302(8).

■ Two distinctions are pertinent. As a matter of substantive law, generally, the ICRA and not the U.S. Constitution is the source of the rights. *See Santa Clara Pueblo*, 436 U.S. at 56, 98 S.Ct. at 1675–76; J. Resnik, *Dependent Sovereigns: Indian Tribes, States and the Federal Courts*, 56 U. Chi. L.Rev. 671, 694 (1989) ("Members of Indian tribes cannot make Bill of Rights claims against their tribes."). Secondly, such claims of violations of civil rights must be heard in the tribal courts, not in the federal courts. With the exception of petitions for habeas corpus relief, Congress did not intend in the ICRA to create implied causes of action to redress substantive rights in federal court.[5] *See Santa Clara Pueblo*, 436 U.S. at 59–66, 98 S.Ct. at 1677–81. Similarly, if this is an internal tribal matter, then the tribal court will have authority over the essence of the state constitutional claims. The ICRA contains its own equal protection and due process guarantees. Akins's state constitutional claims rest on similar guarantees. This is not a potential instance of a right without a remedy.[6]

## V.

■ Is the issuance of stumpage permits an "internal tribal matter"? The language of the statute itself is the first resort. That language refers to:

> internal tribal matters, including membership in the respective tribe or nation, the right to reside within the respective Indian territories, tribal organization, tribal government, tribal elections and the use or disposition of settlement fund income....

Me.Rev.Stat. Ann. tit. 30, § 6206(1). Because the wording used is "including," the specific categories are exemplars and not exclusive. The examples provide limited guidance. The stumpage permit policy does not fit neatly within any of these categories. It might be argued it fits within "tribal government" but such an argument rests on inherently too broad a reading of the phrase. That a tribe attempts to govern a matter does not render it an internal tribal matter.

A number of strong considerations point to the stumpage policy being an internal tribal matter. First, and foremost, the policy purports to regulate only members of the tribe, as only tribal members may even apply for permits. The interests of non-members are not at issue. Thus, it appears to be an "internal" tribal matter. Second, the policy has to do with the commercial use of lands acquired by the Nation with the federal funds it received for this purpose as part of the settlement agreement. These lands are

---

**5.** While Akins may view a tribal court as a less desirable forum than federal court, the Supreme Court has said that "even if a jurisdictional holding occasionally results in denying an Indian plaintiff a forum to which a non-Indian has access, such disparate treatment of the Indian is justified because it is intended to benefit the class of which he is a member by furthering the congressional policy of Indian self-government." *Fisher v. District Ct.*, 424 U.S. 382, 390–91, 96 S.Ct. 943, 948, 47 L.Ed.2d 106 (1976). The Court has recognized that subjecting purely intra-tribal disputes to state jurisdiction has the potential to undermine the authority of tribal courts and of the tribal government. *See Santa Clara Pueblo*, 436 U.S. at 59–60, 98 S.Ct. at 1677–78.

**6.** The Penobscot Nation concedes, both in its brief and again at oral argument, that Akins's equal protection and due process claims may be brought under the Indian Civil Rights Act, and may be brought against the Nation, in the Penobscot Nation Tribal Court.

"Penobscot Indian Territory" and are subject to federal restraints on alienation. *See* 25 U.S.C. § 1724; Me.Rev.Stat. Ann. tit. 30, § 6205. The policy regulates the very land that defines the territory of the Nation, and so appears to be a "tribal" matter. Third, the policy concerns the harvesting of a natural resource from that land; and permit fees paid benefit the Penobscot Nation. The control of the permitting process operates as a control over the growth, health, and reaping of that resource. Fourth, the policy, at least on its face, does not implicate or impair any interest of the state of Maine. Fifth, it is consistent with prior legal understandings to view the issuance of stumpage permits as an internal tribal matter.

There are also arguments that this is not an internal tribal matter. First, logging permits are issued by municipalities as a standard part of municipal powers. But it is surely too broad a test to ask whether a municipality engages in the same activity. Every activity specifically listed in the statute as an exemplar of an internal tribal matter is also engaged in by a municipality.

The second and more interesting argument advanced by Akins is that, outside of the categorical exemplars, the focus should be historical and tribe specific. The Penobscots, Akins says, have offered no evidence that they have historically been loggers or supported themselves through timber harvesting. Logging, Akins says, is a major commercial activity in Maine and historically has been engaged in by others, and is not "uniquely Indian" nor "of particular cultural importance" to the Nation.

Akins analogizes the expansion of the Nation into the economics of commercial logging to the expansion of the tribe into commercial gambling, an activity that the Maine Law Court has specifically held is not an "internal tribal matter." *See Stilphen,* 461 A.2d 478 (holding that an illegal bingo game run by the Nation did not qualify as an internal tribal matter); *see also Passamaquoddy Tribe,* 75 F.3d at 787–88 (holding that Congress did not intend to give the Maine tribes any rights under the Indian Gaming Regulatory Act). At the very least, Akins argues, the dismissal of his action should be vacated

and the case remanded for a hearing on whether logging is a traditional tribal activity and whether the stumpage policy reinforces traditional tribal values.

The Nation responds to this latter argument vigorously. The Nation retorts that it is not a museum piece and may not be relegated to historic roles. If the Nation is truly to exercise its residual sovereignty, it must be free to act within the present marketplace and not be stereotypically restricted to ancient forms of economic support. Narrow historical analysis, the Nation says, should play almost no role. Accordingly, the Nation argues that the Maine Law Court was wrong in *Stilphen* when it focused on historic culture or development to define internal tribal matters. *See Stilphen,* 461 A.2d at 490.

Such broad themes do not help to define the rules of decision in these cases. At the same time Congress was enacting the Settlement Act the Supreme Court noted that, " '[g]eneralizations in this subject [of tribal authority] have become ... treacherous.' " *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 141, 100 S.Ct. 2578, 2582, 65 L.Ed.2d 665 (1980) (quoting *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973)). Generalizations are no less treacherous today, almost two decades later. We tread cautiously and write narrowly, for the problems and conflicting interests presented by this case will not be the same as the problems and interests presented by the next case.

Context informs our approach. This is not a dispute between Maine and the Nation over the attempted enforcement of Maine's laws. This does not involve a direct or indirect regulation of the Nation by Congress. This is also not a dispute over application of statutory rights Congress may have wished to apply uniformly, regardless of whether the application involved Indian lands or Indian government. This is not an instance of potential conflict or coincidence of Maine law and federal statutory law. This is not even a situation of substantive rights regarding stumpage permits granted to persons by statute, state or federal. This is instead a question of allocation of jurisdiction among

different fora and allocation of substantive law to a dispute between tribal members where neither the Congress nor the Maine Legislature has expressed a particular interest. The federal courts have jurisdiction over this case only if the stumpage permits are not internal tribal matters.

The five considerations outlined earlier, taken together, resolve the question in favor of this being an internal tribal matter and do so as a matter of law. Though future cases may require some exploration of evidence as to whether the underlying subject is an internal tribal matter before decision of the jurisdictional question, this case does not.

Of great significance is that this is an intra-tribal dispute. It involves only members of the tribe, and not actions by the Nation addressed to non-members. The tribe's treatment of its members, particularly as to commercial interests, is not of central concern to either Maine or federal law (other than through the ICRA). There appear to be no strong policy reasons not to view this as an area appropriate for internal tribal regulation.

Secondly, the subject matter appears to be one which the settlement statutes viewed as being within legitimate tribal concern; both the Implementing Act, § 6203, and the Settlement Act, § 1722, define "land and other natural resources" as meaning, inter alia, "timber and timber rights." [7] The Settlement Act provides that the natural resources within the Penobscot Indian Territory may, at the request of the Nation, be leased, sold, or subject to right of way, in accord with other sections of Title 25. *See* 25 U.S.C. § 1724(g). It has long been understood that the power to issue permits is an indirect method of managing a natural resource. *See California Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 107 S.Ct. 1419, 94 L.Ed.2d 577 (1987). To a large extent, the subject matter here involves the regulation and con-

servation of natural resources belonging to the tribe.

Third, the subject matter, involving tribal lands, appears to have no impact on Maine's environmental or other interests. By its own terms, the Implementing Act, § 6204, makes state laws regulating land use or management, conservation and environmental protection applicable to tribal lands. The absence of an assertion that any such laws are involved here is telling. *Cf. Narragansett,* 89 F.3d at 922 (enjoining construction of housing until the tribe complied with the requirements of state coastal resources management program). Under such circumstances, arguments about history, which may be pertinent in other contexts and for addressing other problems,[8] offer little here.

We test our conclusions against a different history, the legislative history, because the language of the Implementing and Settlement Acts does not clearly dispose of the question. *See Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984) ("Where, as here, resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear."); *Penobscot Indian Nation v. Key Bank,* 112 F.3d 538, 548 (1st Cir.1997) (inquiry into legislative history is "particularly appropriate in the context of federal Indian law"); *Massachusetts v. FDIC,* 102 F.3d 615, 620 (1st Cir.1996). That legislative history is only somewhat helpful because it embodies two conflicting approaches to resolving the question of what is an internal tribal matter. On the one hand, Congress described the settlement as "original" and "innovative." On the other hand, the Congress referred to respecting the inherent self-governing authority of a tribe. In so doing, it referred to a Supreme Court opinion, *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978).

---

7. That language is used in part to define the meaning of Indian lands and used to extinguish claims that much earlier transfers of lands had not complied with the Trade and Intercourse Act of 1790, and other claims. *See* 25 U.S.C. § 1723.

8. Debates about the role to be played by historical and anthropological evidence in Indian cases are not new. In the trial court in *Santa Clara,* such evidence was explored, and commentators have questioned whether it is relevant to the issue of sovereignty. *See* Resnik, 56 U. Chi. L.Rev. at 705–09.

We look to the Committee Report of the Senate Select Committee on Indian Affairs concerning the Settlement Act. *See Garcia v. United States,* 469 U.S. 70, 76, 105 S.Ct. 479, 483, 83 L.Ed.2d 472 (1984) (Committee Reports on a bill are authoritative source for determining legislative intent). That report explains that the "treatment of the Passamaquoddy Tribe and Penobscot Nation in the Maine Implementing Act is original. It is an innovative blend of customary state law respecting units of local government coupled with a recognition of the independent source of tribal authority, that is, the inherent authority of a tribe to be self-governing." S.Rep. No. 96–957, at 29 (1980) (citing *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106).

In the final Committee Reports on the Settlement Act, both the House and the Senate addressed the Nation's concern that "the settlement amounts to a 'destruction' of the sovereign rights and jurisdiction of the ... Penobscot Nation." S.Rep. No. 96–957, at 14; H.R.Rep. No. 96–1353, at 14–15 (1980), U.S.Code Cong. & Admin.News 1980, 3786, at 3790. Before the settlement, the federal government had not formally recognized the Penobscot Nation as an Indian tribe and the State of Maine had long assumed that the Maine tribes had no inherent sovereignty. *See Bottomly v. Passamaquoddy Tribe,* 599 F.2d 1061, 1063–65 (1st Cir.1979). The Reports state that "While the settlement represents a compromise in which state authority is extended over Indian territory to the extent provided in the Maine Implementing Act, ... the settlement provides that henceforth the tribes will be free from state interference in the exercise of their internal affairs. Thus, rather than destroying the sovereignty of the tribes, by recognizing their power to control their internal affairs ... the settlement strengthens the sovereignty of the Maine Tribes." S.Rep. No. 96–957, at 14; H.R.Rep. No. 96–1353, at 14–15, U.S.Code Cong. & Admin.News 1980, at 3790.

The Committee Report also referred to the *Santa Clara Pueblo* case, which concerned whether Title I of the ICRA authorized civil actions in the federal courts to enforce its substantive provisions. At issue was the definition of tribal membership, which the tribe extended to children of males who married outside the tribe but not to children of females who married outside the tribe. The Supreme Court held that the ICRA vested jurisdiction in the tribal courts and not the federal courts. The Court recognized both that Congress had the power to limit the powers of local self-government that tribes possessed and that Congress intended in the ICRA to balance dual objectives. Under such circumstances, the Court would not infer from Congressional silence a cause of action in the federal courts.

Congress' citation to the *Santa Clara Pueblo* opinion in the Senate Report reinforces the tension between the dual objectives of the Settlement Act: between an original, innovative allocation of authority between the State and tribes and the desire to recognize the tribe's inherent self-government authority. From Congressional silence we are hesitant to read an intent to expand federal court jurisdiction where it appears, as it does here, that inherent self-governing authority of a tribe is involved. We stress that we do not read the reference by Congress to *Santa Clara Pueblo* in the legislative history of the Settlement Act as invoking all of prior Indian law. That would be inconsistent with the unique nature of the Maine settlement and the specific provisions of the Act limiting the application of federal Indian law. But we also do not agree that reference to such law is never helpful in defining what is an internal tribal matter. Congress was explicitly aware of such law, and explicitly made existing general federal Indian law applicable to the Penobscot Nation in the Settlement Act. In other areas, courts have long presumed that Congress acts against the background of prior law. *See, e.g., Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 405, 107 S.Ct. 750, 760, 93 L.Ed.2d 757 (1987); *Kolster v. INS,* 101 F.3d 785, 787–88 (1st Cir.1996).

▮ General federal Indian caselaw supports our conclusion. The cases uniformly recognize the importance of the factors we have stressed: that the issue involves matters between tribe members and matters of

the economic use of natural resources inherent in the tribal lands. "When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest." *White Mountain Apache Tribe,* 448 U.S. at 144, 100 S.Ct. at 2584. In *White Mountain Apache,* a non-Indian logging company challenged the applicability of state taxes to its exclusively on-reservation operations. The Court said that the tradition of Indian sovereignty over their reservations informed the determination that the exercise of state authority was preempted by federal law. The Court reviewed the "basic principles" established by its prior decisions regarding the "boundaries between state regulatory authority and tribal self-government." *Id.* at 141, 100 S.Ct. at 2582. The Court emphasized the "significant geographical component to tribal sovereignty" and said that "though the reservation boundary is not absolute, it remains an important factor to weigh in determining whether state authority has exceeded the permissible limits." *Id.* at 151, 100 S.Ct. at 2587.

Similarly, in *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982), the Court held that the tribe had the inherent authority to impose a severance tax on on-reservation mining activities as part of its power to be self-governing. This power derived from "the tribe's general authority, as sovereign, to control economic activity within its jurisdiction" and extended to transactions " 'occurring on trust lands and significantly involving a tribe or its members....' " *Id.* at 137, 102 S.Ct. at 901 (quoting *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 152, 100 S.Ct. 2069, 2080–81, 65 L.Ed.2d 10 (1980)).

Where, in contrast, the issue involves tribal attempts to regulate non-tribal members, the Supreme Court has often found that those attempts are not within the inherent

self-governing powers of a tribe. *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), held that the Crow Indians did not have the power to regulate hunting and fishing by non-Indians on reservation lands owned by non-Indians. The Court said that the tribal "powers of self-government .... involve only the relations among members of a tribe." *Id.* at 564, 101 S.Ct. at 1257.

Similarly, in *Strate v. A–1 Contractors,* —— U.S. ——, ——, 117 S.Ct. 1404, 1409, 137 L.Ed.2d 661 (1997), the Court reaffirmed *Montana*'s holding that, in general, the inherent sovereign powers of a tribe " 'do not extend to the activities of nonmembers of the tribe.' " (quoting *Montana,* 450 U.S. at 565, 101 S.Ct. at 1258). The Court also noted that "tribes retain considerable control over nonmember conduct on tribal land." *Id.* at ——, 117 S.Ct. at 1413. Here, only tribal conduct is at issue.

▅▅▅ The legislative history and precedent thus reinforces our conclusion that this dispute involves an "internal tribal matter" and that, accordingly, no claim is stated under § 1983 or under Maine law.[9]

The judgment of the district court is *affirmed.* Costs to appellees.

---

9. Appellants' claims under § 1985(3) and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02 fail for the same reasons. Neither statute, in itself, creates a substantive cause of action. *See Great Am. Fed. S. & L. Assn. v. Novotny,* 442 U.S. 366, 372, 99 S.Ct. 2345, 2349, 60 L.Ed.2d 957 (1979) (§ 1985(3)); *Colonial Penn Group, Inc. v. Colonial Deposit Co.,* 834 F.2d 229, 232 (1st Cir.1987) (Declaratory Judgment Act). Appellants must rely on an independent source for their claims, and there is none present which is capable of being asserted in federal court.