**PENOBSCOT NATION, Plaintiff,**

v.

**Cynthia A. FELLENCER, Defendant.**

**Civ. No. 97–231–B.**

United States District Court, D. Maine.

March 13, 1998.

121

Kaighn Smith, Jr., Drummond, Woodsum & MacMahon, Portland, ME, for Plaintiff.

Michael A. Duddy, Kozak, Gayer & Broder, P.A., Bangor, ME, for Defendant.

Ann C. Juliano, U.S. Dept. of Justice Environment Div., Washington, DC, for Amicus Curiae.

## ORDER AND MEMORANDUM
## OF DECISION

BRODY, District Judge.

Plaintiff, Penobscot Nation ("the Nation" or "the Tribe"), seeks a permanent injunction enjoining Defendant, Cynthia A. Fellencer, a former employee of Plaintiff, from pursuing claims arising under the Maine Human Rights Act, 5 M.R.S.A. § 4551 *et seq.* ("MHRA"), against it in the matter of *Fellencer v. Penobscot Indian Nation*, No. CV–95–275 (Maine Superior Court, Penobscot County, filed Aug. 14, 1995), and a declaration that Defendant's claims under the MHRA violate Plaintiff's right to govern its internal affairs as established by the Maine Indian Claims Settlement Act of 1980, 25 U.S.C. § 1721 *et seq.* ("Settlement Act").

Plaintiff and Defendant have filed cross-motions for summary judgment and the Justice Department, on behalf of the United States, has filed an *Amicus Curiae* Memorandum in support of Plaintiff's motion. For the reasons discussed more fully below, the Court holds that the Nation's employment of Defendant is not an "internal tribal matter" and is, therefore, subject to state law and the requirements of the MHRA. Thus, Defendant's motion is GRANTED and Plaintiff's motion is DENIED.

## I. SUMMARY JUDGMENT

Summary judgment is appropriate in the absence of a genuine issue as to any material fact and when the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). An issue is genuine for these purposes if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is one that has "the potential to affect the outcome of the suit under applicable law." *Nereida–Gonzalez v. Tirado–Delgado,* 990 F.2d 701, 703 (1st Cir. 1993). For the purposes of summary judgment the Court views the record in the light most favorable to the nonmoving party. *See McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995).

## II. BACKGROUND

The relevant facts of this case are largely undisputed. Defendant, who is not a member of the Nation, was hired by Plaintiff to work in the Penobscot Nation Health Department as a Community Health Nurse/Diabetes Program Coordinator in or around December, 1992, or January, 1993. Defendant was paid out of governmental funds of the Nation and her duties included treating sick and elderly members of the Nation, filing reports relating to communicable diseases with Indian Health Services, coordinating a Diabetes Interdisciplinary Team, and serving as an AIDS Prevention Coordinator. Def.'s Ex. 2; Pl.'s Statement of Material Facts ("SOF") ¶ 3. She worked in this capacity until September, 1994, when the Penobscot Nation Tribal Council ("Tribal Council") voted to terminate her employment. Pl.'s SOF ¶ 4. According to Plaintiff, Fellencer was fired after the Tribal Council received complaints about mistreatment of tribal members. *Id.* However, in a letter addressed to Fellencer dated September 27, 1994, the Governor of the Nation, Jerry Pardilla, admitted that the Tribal Council "over-stepped its authority," provided Fellencer "no opportunity ... to respond" to charges against her, and "subvert[ed] the Personnel Policies and sought to force your resignation." Def.'s Ex. 4. Governor Pardilla wrote that the Council fired Fellencer for "political reasons" and admitted that "there is no existent procedural basis for requesting your resignation, and; further, it is not based on an objective evaluation of your work performance." *Id.*

In October, 1994, Defendant filed an administrative complaint against Plaintiff with the Office of Federal Contract Compliance Programs ("OFCCP"), asserting that the Nation discharged her for discriminatory reasons in violation of a federal contract between the Penobscot Nation and the federal Indian Health Services agency that provided funding for her position at the Penobscot Nation Health Department. Fellencer Aff. ¶ 12. The OFCCP attempted to conduct an investigation of Defendant's allegations but was rebuffed by the Nation which contended OFCCP lacked jurisdiction over the matter. Def.'s Ex. 4.

On November 2, 1994, Defendant filed a charge of discrimination with the Maine Human Rights Commission ("MHRC") and the U.S. Equal Employment Opportunity Commission ("EEOC") alleging that she was discharged on the basis of her race and national origin. Pl.'s Ex. 6. On January 30, 1995, the MHRC informed Defendant that her charge had been dismissed because the MHRC lacked jurisdiction over matters involving employment by the tribal government. Pl.'s Ex. 1. The MHRC relied entirely on a 1984 opinion of the Maine Attorney General which concluded that under the Settlement Act employment decisions of the Nation are "internal tribal matters," and therefore not subject to regulation by the State of Maine. Pl.'s Ex. 1.

Defendant then petitioned the Penobscot County Superior Court for review of the MHRC's decision. Pl.'s Ex. 8. The Superior Court dismissed Defendant's action on the ground that the MHRC's decision was not a final judgment warranting appellate review, but, rather, an administrative decision which did not affect her substantive rights. Pl.'s Ex. 9. The court indicated, however, that Defendant was free to bring a direct action against the Nation. *Id.* Defendant then filed a complaint against the Nation in Superior Court on August 14, 1995, alleging violation of the MHRA and breach of contract. Pl.'s Ex. 10.

The Nation moved to dismiss Defendant's claim on the ground that the MHRA does not apply to the Penobscots. Superior Court Judge Donald H. Marden, in a nine-page opinion, denied the Nation's motion. *Fellencer v. Penobscot Indian Nation*, No. CV–95–275 (Maine Superior Court, Penobscot County, July 30, 1996) (order denying motion to dismiss). Relying on *Penobscot Nation v. Stilphen*, 461 A.2d 478, 490 (Me.1983), in which the Maine Law Court reasoned that "internal tribal matters" refers to those matters historically and culturally significant or unique to the Nation, Judge Marden declined to rule as a matter of law that all employment decisions of the Nation invoke areas of

particular cultural importance. Determining the applicability of the MHRA to the Nation in this case, according to Judge Marden, requires an evaluation of "the cultural, historical and/or societal role the Community Health Nurse plays in the Penobscot Nation," which is more appropriately conducted at trial. *Fellencer v. Penobscot Indian Nation*, No. CV–95–275, slip op. at 5. Following a series of discovery disputes, the Nation brought suit in this Court seeking declaratory and injunctive relief and the Superior Court granted a stay of the state proceedings until disposition of this case.

## III. DISCUSSION

### A.

The primary issue of this case is whether the Nation's employment of a Community Health Nurse is an "internal tribal matter" for the purposes of the Settlement Act.

While defining what constitutes an internal matter controlled by Indian tribes is hardly novel in Native American law, it is novel in this context. The relations between Maine and the Penobscot Nation are not governed by all of the usual laws governing such relationships, but by two unique laws, one Maine and one federal, approving a settlement.

*Akins v. Penobscot Nation*, 130 F.3d 482, 483 (1st Cir.1997). The Settlement Act established a unique legal relationship between the Maine tribes and the State of Maine and subjected the Penobscot Nation and its members "to the jurisdiction of the State of Maine to the extent and in the manner provided in the Maine Implementing Act...." 25 U.S.C. § 1725(b)(1).[1] The Maine Implementing Act, 30 M.R.S.A. §§ 6201–6214 ("Implementing Act"), which was "approved, ratified, and confirmed" by Congress in the Settlement Act, 25 U.S.C. § 1725(b)(1), provides:

Except as otherwise provided in this Act, all Indians, Indian nations, and tribes and bands of Indians in the State and any lands or natural resources owned by them, held in trust for them by the United States

---

1. For a more thorough discussion of the nature and genesis of the Settlement Act and the Implementing Act, *see Akins*, 130 F.3d at 484; *Passa-*

*maquoddy Tribe v. Maine*, 75 F.3d 784, 787 (1st Cir.1996); *Penobscot Nation v. Stilphen*, 461 A.2d 478, 487–88 (Me.1983).

or by any other person or entity shall be subject to the laws of the State and to the civil and criminal jurisdiction of the courts of the State to the same extent as any other person or lands or other natural resources therein.

30 M.R.S.A. § 6204. The Implementing Act clarifies the powers of the Penobscot Nation as those of a municipality, with an exception for "internal tribal matters."

> Except as otherwise provided in this Act, the Passamaquoddy Tribe and the Penobscot Nation, within their respective Indian territories, shall have, exercise and enjoy all the rights, privileges, powers and immunities, including, but without limitation, the power to enact ordinances and collect taxes, and *shall be subject to all the duties, obligations, liabilities and limitations of a municipality of and subject to the laws of the State, provided, however, that all internal tribal matters,* including membership within the respective tribe or nation, the right to reside within the respective Indian territories, tribal organization, tribal government, tribal elections and the use or disposition of settlement fund income *shall not be subject to regulation by the State.*

30 M.R.S.A. § 6206(1) (emphasis added). Therefore, unless the employment of Fellencer was an "internal tribal matter," Plaintiff, like any other municipality in the State of Maine, is subject to the requirements of the MHRA.

### B.

Citing Congress' general plenary power over Indian tribes and the congressional role in the adoption of the Settlement Act and the Implementing Act, Plaintiff first argues that the interpretation of "internal tribal matter" is governed by federal law and that its right to be free from regulation in internal tribal matters is a federal right. Plaintiff then argues that the language of the Implementing Act, First Circuit precedent, and general Indian common law compel the conclusion that tribal government employment decisions are "internal tribal matters." The essence of Plaintiff's claim is that if employment decisions of the tribal government are made "the subject of scrutiny" under the MHRA, "the very decision-making process of tribal government is laid open to state authority." Pl.'s Mot.Summ.J. at 17.

Defendant, on the other hand, argues that the "internal tribal matters" inquiry should be based on state law and urges the Court to use the analysis adopted by the Law Court in *Stilphen,* or, in the alternative, to use the "five considerations" of the First Circuit's recent decision in *Akins.* Defendant emphasizes the fact that she is not a tribal member and that this is, therefore, not an intra-tribal dispute, and that the employment decisions of the Nation implicate an important state interest in protecting against discrimination.[2] The Court addresses each of these arguments in turn.

### C.

 This is not the first time this Court has been called upon to determine the scope of the "internal tribal matters" exception to the Implementing Act, nor is it likely to be the last. This Court, the First Circuit, and the Maine Law Court have approached this issue at various times with different emphases, the common strand in this line of cases

---

**2.** In addition to arguing against Plaintiff's motion on the merits, Defendant asks the Court to abstain from asserting jurisdiction and argues that Plaintiff's request for a declaratory judgment is not ripe. Defendant claims that abstention is appropriate because the Superior Court proceeding has thoroughly addressed the same issues raised here, because the Settlement and Implementing Acts require a federal court to defer to the judgment of the state court, and because Defendant's claims involve a substantial state interest. Had the Superior Court not agreed to stay its proceedings Defendant might have a strong abstention argument. However, the fact that the state court has deferred to the judgment of this Court suggests that this is not an "exceptional circumstance" warranting abstention. *See DeNovellis v. Shalala,* 124 F.3d 298, 313 (1st Cir.1997). Mindful that "a litigant 'does not have to await the consummation of threatened injury to obtain preventative relief'" in the declaratory judgment context, the Court is satisfied that this controversy is sufficiently adverse to satisfy the ripeness requirement and that a declaratory judgment would serve a useful purpose. *Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 692–93 (1st Cir.1994) (quoting *Pacific Gas & Elec. Co. v. State Energy Resources Conserv. & Dev't Comm'n,* 461 U.S. 190, 201, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983)).

being the conclusion that "internal tribal matters" is a case specific inquiry that does not easily lend itself to simple generalizations. At the outset the Court notes that, Defendant's claim to the contrary, the First Circuit has made it clear that the "internal tribal matters" inquiry is a matter of federal law. *Akins*, 130 F.3d at 485 & n. 4.[3]

■ The first of the cases in this area was *Stilphen*, 461 A.2d 478, in which the Law Court held that the Nation's operation of beano games, prohibited by state law in the absence of a license, was not an "internal tribal matter" and therefore was subject to state regulation. The court reasoned that although the list of "internal tribal matters" in section 6206(1) of the Implementing Act is not exclusive, the general term "internal tribal matters" followed by a list of illustrations is assumed to embrace only concepts similar to those illustrations. *Id.* at 489. The Court concluded that beano was not embraced within that term because it is not a "concept similar to" the illustrations provided. *Id.* As a result, under the Law Court's approach, the term "internal tribal matters" is to be read as "embrac[ing] only those matters illustratively listed in the statute and other matters like them," *id.* at 490, and the sphere within which the Tribe can operate free of state regulation is "narrow." *Id.* at 482.

Although the Law Court could have rested there, it added that beano "played no part in the Penobscot Nation's historical culture or development. It is not uniquely Indian in character. It is not a traditional Indian practice and has no particular cultural importance for the Nation." *Id.* at 490. This "unique cultural or historical interest" approach was derived from the legislative history which suggested to the Law Court that the State of Maine, Congress, and the Penobscot Nation believed the purpose of the "internal tribal matters" exception was primarily to protect cultural interests of the Indians. *Id.*

In *Mitchell v. Passamaquoddy Tribe*, No. 89–0073–B (D.Me. Jan. 9, 1990) (Recommended Disposition of the Magistrate), *aff'd* (D.Me. Feb. 1, 1990), the plaintiff, a tribal policeman who was fired by the Tribe, alleged violations of 42 U.S.C. §§ 1981 and 1983, as well as state causes of action against the Passamaquoddy Tribe in federal court. The court held that the Tribe had not acted "under color of state law" because an action to terminate an employee was a matter of tribal law rather than state law. *Id.* slip op. at 7. The court, relying heavily on general Indian common law, concluded that "given the relatively sovereign status of the Passamaquoddy Tribe, control over the hiring and firing of a member of the tribal police force is 'an internal tribal matter,' or more specifically, an integral part of tribal government as specified in 30 M.R.S.A. § 6206(1)." *Id.*

The *Mitchell* court departed from the *Stilphen* approach [4], relying primarily on principles of general Indian common law to arrive at the conclusion that the Tribe has a "sovereign, non-municipal status," *id.* slip op. at 6, despite the fact that the Implementing Act explicitly grants the Passamaquoddy and Penobscot Nations the rights and duties of municipalities subject only to the "internal tribal matters" exception. The First Circuit has since suggested that, although at times instructive, general federal Indian common law should not necessarily be the sole or primary source of guidance in interpreting the Implementing Act because of the unique nature of the federal and state relationship with the Maine tribes. *Akins*, 130 F.3d at 489. As such, *Mitchell*, with its nearly exclusive reliance on general Indian common law, is of limited assistance to this inquiry and the Court does not consider it binding precedent.

---

3. Defendant asks the Court to disregard the First Circuit's statement "[u]nder the Settlement Act, we consider [this] to be a question of federal law ..." as dictum because in *Akins* the parties agreed that the case was to be governed by federal law. *Akins*, 130 F.3d at 485. Contrary to Defendant's assertion, the First Circuit did not apply exclusively federal law in *Akins* because the parties so agreed. Rather, it did so after concluding that the language of the Settlement Act and the intent of Congress indicated that the matter was to be governed by federal law. *Akins*, 130 F.3d at 485 n. 4.

4. *Stilphen* concluded that "internal tribal matters" must be interpreted not in light of federal Indian common law, but according to the Implementing Act and its legislative history. *Stilphen*, 461 A.2d at 482.

In the most recent and thorough interpretation of the Settlement Act and the Implementing Act, the First Circuit addressed the "internal tribal matters" provision in the context of the Nation's issuance of stumpage permits. *Akins,* 130 F.3d 482. The plaintiff in that case sued under 42 U.S.C. § 1983, among other grounds, alleging that he was denied a permit in violation of due process and equal protection. The court held that the Nation's stumpage permit policy, limiting issuance to tribal members who were residents of Maine, was an "internal tribal matter" and, thus, that federal and state courts lacked subject matter jurisdiction over the dispute. *Akins,* 130 F.3d at 488. The Court looks primarily to the principles enunciated in *Akins* for guidance in the present case.

The *Akins* court looked first to the language of the Implementing Act, concluding that the listed categories of "internal tribal matters" are "exemplars and not exclusive." *Id.* at 486. As in *Akins,* the language of the Implementing Act provides limited guidance here. Tribal employment of non-member medical personnel does not fit easily within the "tribal organization" or "tribal government" categories.

 Plaintiff contends that forcing it to "submit to the laws and procedures of the State of Maine" harms its right to be "self-governing" and to "control its internal affairs" without state regulation. Pl.'s Mot. Summ.J. at 8. The language of the Implementing Act granting the Nation independence in internal tribal matters, "including ... tribal organization, [and] tribal government," however, does not necessarily carry with it the absolute right to be self-governing or to control all internal affairs without regard for state law. As the *Stilphen* court aptly observed, "one would be rash to equate ["internal tribal matters"] with such terms as 'internal and social relations,' 'internal affairs,' or 'tribal self government,' merely because of a partial language overlap." *Stilphen,* 461 A.2d at 489 (citations omitted). The fact that some tribal government matters may be sufficiently "internal" to justify protection from outside regulation does not mean that all tribal government actions are shielded from the reach of state law. "That

a tribe attempts to govern a matter does not render it an internal tribal matter." *Akins,* 130 F.3d at 486.

Finding the broad language of the Implementing Act relatively unhelpful, the *Akins* court then identified five factors that supported a finding that the Nation's stumpage policy was an internal tribal matter. *Id.* First, "and foremost," the policy at issue purported to regulate only members of the Tribe and "the interests of non-members were not at issue." *Id.* Second, the policy regulated "the very land that defines the territory of the Nation." *Id.* at 487. Third, the policy concerned control over the natural resources of that land. *Id.* Fourth, the policy, at least on its face, did not implicate or impair any interest of the State of Maine. *Id.* Finally, the court concluded that it was "consistent with prior legal understandings to view the issuance of stumpage permits as an internal tribal matter," noting that "[i]t has long been understood that the power to issue permits is an indirect method of managing a natural resource." *Id.* at 487–88. The court rested its decision primarily on these five factors, noting that "taken together, [they] resolve the question in favor of this being a internal tribal matter and do so as a matter of law." *Id.* at 488.

As this case does not involve tribal land, the only *Akins* considerations relevant to this dispute are the interests of non-members and the interests of the State. The Court notes that "[o]f great significance" to the *Akins* decision was the fact that the controversy was "an intra-tribal dispute ... involv[ing] only members of the tribe, and not actions by the Nation addressed to non-members." *Id.* The *Akins* court concluded that "[t]he tribe's treatment of its members, particularly as to commercial interests, is not of central concern to either Maine or federal law ...", and, therefore, that "there appear to be no strong policy reasons not to view this as an area appropriate for internal tribal regulation." *Id.* However, when "the issue involves tribal attempts to regulate non-tribal members, the Supreme Court has often found that those attempts are not within the inherent self-governing powers of a tribe." *Id.* at 490 (citing *Montana v. United States,* 450 U.S.

544, 564, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981)). Unlike *Akins*, the tribal action in this case directly implicates the rights of a non-member.

Moreover, there is little doubt that the Nation's action in this case potentially impairs an important interest of the State of Maine. It is the well established policy of the State "to keep continually in review all practices infringing on the basic human right to a life with dignity ... and to prevent discrimination in employment .... on account of race, color, sex, physical or mental disability, religion, ancestry or national origin...." 5 M.R.S.A. § 4552. "The Fair Employment provisions of the MHRA specifically declare as the policy of the State of Maine that every individual has the civil right to secure employment without discrimination...." *Maine Human Rights Comm'n v. Canadian Pacific Ltd.*, 458 A.2d 1225, 1230 (Me.1983). The MHRA "was meant to have very broad coverage," *Maine Human Rights Comm'n v. Local 1361, United Paperworkers Int'l Union*, 383 A.2d 369, 373 (Me.1978); and explicitly includes the actions of municipalities within its scope. 5 M.R.S.A. § 4553(4) & (7). Whereas the subject matter of the *Akins* suit appeared to have no impact on Maine's laws or other interests, the Nation's action here threatens to undermine an extensive state scheme for protecting citizens of Maine against discrimination. In any other employment context Defendant would be entitled to protection against discrimination. To recognize an absolute tribal immunity from the discrimination laws of the State would clearly frustrate the important state policies that the MHRA serves.

Although the two relevant policy considerations enunciated in *Akins* strongly suggest that Defendant's employment relationship with the Nation is not an "internal tribal matter" free from the regulatory reach of the State, the Court looks beyond the "five considerations" for further guidance, noting that the *Akins* court wrote "cautiously" and "narrowly," because "the problems and conflicting interests presented by [*Akins* ] will not be the same as the problems and interests presented by the next case." *Akins*, 130 F.3d at 487.

### 1. Legislative History

Plaintiff argues that the legislative history of the Settlement Act clearly indicates that the Nation has "inherent authority to be self governing" and that Congress intended "to confirm the Nation's inherent right as a sovereign Indian tribe to be 'free from state interference' in its internal affairs." Pl.'s Mot.Summ.J. at 12–14. Therefore, it argues, its employment decisions cannot be regulated by state law. Although Plaintiff accurately restates portions of the Settlement Act's legislative history, its argument begs the question: what are these "internal affairs" that are protected from state interference? As the First Circuit has recognized, "[t]he legislative history is only somewhat helpful because it embodies two conflicting approaches to resolving the question of what is an internal tribal matter." *Akins*, 130 F.3d at 488. On the one hand, Congress intended an "original, innovative allocation of authority between the State and tribes." *Id.* at 489. On the other hand, it sought to "recognize the tribe's inherent self-government authority." *Id.* As a result, the Settlement Act embodies a compromise between the Nation and the State of Maine; "an innovative blend of customary state law respecting units of local government coupled with a recognition of the independent source of tribal authority...." *Id.* at 489. In light of these competing principles, the legislative history of the Settlement Act does little to clarify the broad language of the Implementing Act, adopted by Congress in the Settlement Act.

Plaintiff contends in the alternative that Congress' intention to protect the Nation from state law discrimination suits can be gleaned from other sources. First, Plaintiff cites the fact that Congress has expressly exempted Indian tribes from the employment discrimination provisions of Title VII of the 1964 Civil Rights Act, and argues that Congress would not have exempted it from Title VII while leaving it open to claims under similar state laws. *See* 42 U.S.C. § 2000e(b). The Court rejected this argument in *Houlton Band of Maliseet Indians v. Maine Human Rights Comm'n*, 960 F.Supp. 449, 455 (D.Me. 1997). As that case thoroughly discussed,

"the Title VII exemption of Indians from its definition of 'employer' does not apply to Indians residing in the State of Maine." *Id.*

Plaintiff also argues that by citing favorably the case of *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), in the legislative history of the Settlement Act, Congress expressed an intent to "protect tribal governments from the adjudication of civil rights complaints in non-tribal forums" regardless of the source of the claim. Pl.'s Mot.Summ.J. at 21–22. *Santa Clara Pueblo* held that the Indian Civil Rights Act of 1968, 25 U.S.C. §§ 1301–1303 ("ICRA"), neither expressly nor impliedly authorized civil actions to enforce its substantive provisions against a tribe or its officers in federal court. *Santa Clara Pueblo,* 436 U.S. at 51–52. Congress, in citing to *Santa Clara Pueblo,* made no reference to the holding of that case or to the immunity of the Nation from all civil rights actions in non-tribal forums. Rather, Congress cited to *Santa Clara Pueblo* for the proposition: "The treatment of the ... Penobscot Nation in the Maine Implementing Act is original. It is an innovative blend of customary state law respecting units of local government coupled with a recognition of the independent source of tribal authority, that is, the inherent authority of a tribe to be self-governing." S.Rep. No. 96–957, at 29 (1980). This reference to *Santa Clara Pueblo* is not to be read as invoking all of prior Indian law, for "[t]hat would be inconsistent with the unique nature of the Maine settlement and the specific provisions of the Act limiting the application of federal Indian law." *Akins* 130 F.3d at 489. Congress recognized that the post-settlement Nation had aspects of both an independent sovereign and a local government subject to state law. It is not without significance that Congress, immediately after citing *Santa Clara Pueblo,* stated:

> The Passamaquoddy Tribe and Penobscot Nation shall have all the powers, immunities, and obligations of any municipality under state law; [the Implementing Act] obligates the Tribe and Nation to extend to non-members residing within the Passamaquoddy Indian Territory or the Penobscot Indian Territory the services and benefits provided by them as municipalities; and it

extends to the Tribe and Nation the same protections and exposure that any municipality or municipal official enjoy with respect to suit in the courts of the State or the United States.

S.Rep. No. 96–957, at 29.

Nor does it make sense to read Congress' reference to *Santa Clara Pueblo* as insulating the Nation from all civil rights actions. *Santa Clara Pueblo* involved nothing more than statutory interpretation of the Indian Civil Rights Act in light of the common law immunity from suit traditionally enjoyed by sovereign powers. 436 U.S. at 58–61. Application of all of the general principles enunciated in *Santa Clara Pueblo* to the Penobscots would render many of the subsequently negotiated provisions of the Implementing Act irrelevant or without effect. The Court will not impute such an intent to Congress.

### 2. Federal Indian Common Law

Although the Settlement Act does not invoke all of prior federal Indian common law, reference to such law may sometimes be helpful in defining what is an "internal tribal matter." *Akins,* 130 F.3d at 489. The Court is mindful, however, that federal precedents may be "... of little help to a court faced with a claim of inherent sovereignty by a tribe that has had little or no historical relationship with the federal government." *Stilphen,* 461 A.2d at 484.

Plaintiff argues that "unanimous authority" from other jurisdictions establishes that challenges to employment decisions of tribal governments outside of tribal forums intrude upon "the federally protected right of Indians to be self-governing and to maintain independent control over reservation affairs." Pl.'s Mot.Summ.J. at 15–16. First, the Court notes that, as discussed above, the Settlement Act does *not* grant the Penobscot Nation the absolute right to be "self-governing and to maintain independent control over reservation affairs." Moreover, any general principles of Indian common law must be considered in light of the unique status of the Penobscot Nation. To support its claim Plaintiff cites three cases without discussion or explanation. Two of the cases cited, *War-*

dle v. Ute Indian Tribe, 623 F.2d 670, 673 (10th Cir.1980), and Stroud v. Seminole Tribe of Florida, 606 F.Supp. 678, 680 (S.D.Fla.1985), stand for the proposition that Indian tribes are subject to federal civil rights laws only when Congress expressly so declares and that Congress has not expressly or impliedly extended several federal discrimination statutes, including 42 U.S.C. §§ 1981, 1983, 1988, 2000d, and the ICRA, to the employment practices of the Indian tribes. Congress has in this case, however, recognized the Penobscot Nation as a municipality generally subject to the laws of the State so long as those laws do not infringe on internal tribal affairs. Unlike Wardle and Stroud, Congress here has expressly authorized all suits against the Nation that could be asserted against a municipality, subject only to the internal tribal matters limitation.

 The Court is persuaded that its conclusion is consistent with general principles of federal Indian caselaw, to the extent they are applicable here. " 'When on-reservation conduct involving only Indians is at issue, state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self government is at its strongest.' " Akins, 130 F.3d at 490 (quoting White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 144, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980)). The case for application of state law is much stronger, however, where the tribal conduct affects the rights of non-members. In Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), the Supreme Court held that the Crow Indians did not have the power to regulate hunting and fishing by non-Indians on reservation lands owned by non-Indians. The Court noted that in matters " 'involving the relations between an Indian tribe and nonmembers of the tribe ...' " there has been an " 'implicit divestiture of sovereignty.' " Id. at 565 (quoting United States v. Wheeler, 435 U.S. 313, 326, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978)). The tribal " 'powers of self-government ... involve only the relations among members of a tribe.' " Id. (quoting Wheeler, 435 U.S. at 326). Likewise, in Strate v. A–1 Contractors, 520 U.S. 438, ——, 117 S.Ct. 1404, 1409, 137 L.Ed.2d 661 (1997), the Court

reaffirmed Montana's holding that, in general, the inherent sovereign powers of a tribe " 'do not extend to the activities of nonmembers of the tribe.' " (quoting Montana, 450 U.S. at 565). The Akins holding found support in general Indian common law because that case involved a dispute between Tribe members. In contrast, where, as here, "the issue involves tribal attempts to regulate non-tribal members, the Supreme Court has often found that those attempts are not within the inherent self-governing powers of a tribe." Akins, 130 F.3d at 490.

### 3. Historical and Cultural Importance

Defendant, arguing that interpretation of the "internal tribal matters" provision of the Implementing Act is an issue of state, rather than federal law, asks that the Maine Superior Court be allowed to proceed with an analysis of the historical and cultural importance of employment decisions to the Nation. As noted above, this issue is governed by federal law and the Court is therefore not bound by the approach taken in Stilphen. Akins, while stopping short of discarding Stilphen's historical and cultural importance analysis altogether, certainly left its integrity in doubt. The First Circuit noted that "[s]uch broad themes do not help to define the rules of decision in these cases," and warned against making generalizations about historical and cultural importance. Id. at 487. While the historical and cultural importance approach may remain appropriate in some, albeit limited, circumstances, see id., at 488, the Court is persuaded that it is not helpful here where other considerations are relevant and where the subject matter of the suit does not appear on its face to be "uniquely Indian."

### 4. Attorney General's Opinion

Finally, Plaintiff notes that in 1984 the Maine Attorney General issued an opinion concluding that "subjecting employment decisions of the Penobscot Nation to the jurisdiction of the Maine Human Rights Commission would create a serious potential of State interference with the internal affairs of the tribal government, a result clearly not in-

tended by the Maine Indian Settlement Act." Op.Att'y Gen. 84–22 (July 25, 1984). This Court, like the Maine Superior Court which also considered this issue, is not persuaded by the Attorney General's decision.

■ This does not mean, however, that all employment decisions of the Nation are necessarily subject to state regulation. There clearly are certain tribal government employment decisions that cannot be regulated by the State because they are inherent to independent organization or governance. Here, however, the Tribal Council has hired an non-member in a non-policymaking capacity for a position traditionally not associated with governance. The hiring and firing of a community nurse does not implicate the Nation's basic right to organize or govern itself. Under these particular circumstances, the Court concludes that the Nation's decision to fire Defendant is not an "internal tribal matter" and is therefore subject to the MHRA.

Plaintiff argues that subjecting its employment decisions to the MHRA will permit the State to "probe the inner-workings of the Penobscot Nation tribal government and its decision making processes." Pl.'s Mot. Summ.J. at 6. Plaintiff objects particularly to discovery requests that may require disclosure of Tribal Council rules and organization and to the fact that members of the Council may be subject to the subpoena power of the State. The complaint in this case does not call into question what form of government the Nation chooses, nor does it require that the court resolve the legitimacy of a tribal election or other such "political dispute." *See Houlton Band,* 960 F.Supp. at 453–54. Rather, the court is called upon solely to decide if the Nation unlawfully discriminated against Defendant in her employment in violation of the MHRA. *See id.* Any incidental effect of such an inquiry that the Nation finds objectionable, such as disclosure of tribal government structure, does not render the Nation immune from the laws of the State where the conduct at issue does not involve an internal tribal matter. *Id.* at 454; *see also Houlton Band of Maliseet Indians v. Boyce,* 688 A.2d 908, 911 (Me.1997). Plaintiff's "judicial intrusion" argument, taken to its logical conclusion, would effectively pre-

clude enforcement of all state laws whenever the Tribal Council is peripherally involved in a suit in a non-tribal forum, regardless of whether the subject matter of such suit implicates internal tribal matters. The Court is persuaded that this is not what Congress or the parties to the settlement intended when the Settlement Act was adopted.

■ "As to state law, the Penobscot Nation and Maine expressly agreed that, *with very limited exceptions,* the Nation is subject to the laws of Maine." *Akins,* 130 F.3d at 484–85 (emphasis added). Included in these exceptions are the *basic* rights of "tribal organization," and "tribal government." Therefore, the Nation has the right to select its form of government and its form of organization, without regard to state influence. However, as *Akins* recently concluded, this does not mean that anything and everything related to "tribal government" or "tribal organization" is absolutely protected. In the absence of infringement on the basic rights of independent government and organization, the Nation is subject to the responsibilities of a municipality and, therefore, to the requirements of the MHRA.

## IV. CONCLUSION

The Penobscot Nation's employment of Defendant is not an "internal tribal matter" and is, therefore, subject to state law and the requirements of the Maine Human Rights Act. Plaintiff's request for injunctive relief and its Motion for Summary Judgment are DENIED. Defendant's Motion for Summary Judgment is GRANTED.

*SO ORDERED.*