United States Court of Appeals
For the First Circuit

No. 98-1326

PENOBSCOT NATION,

Appellant,

v.

CYNTHIA A. FELLENCER,

Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Morton A. Brody, U. S. District Judge]

Before

Lipez, Circuit Judge

Coffin and Campbell, Senior Circuit Judges

Kaighn Smith, Jr., with whom Gregory W. Sample was on brief
for appellant.
Michael A. Duddy for appellee.

January 19, 1999

LIPEZ, Circuit Judge. This case requires us to revisit and
further define the allocation of sovereign powers between the
Penobscot Nation (the Nation) and the State of Maine. The question
before us is whether the decision of the Penobscot Nation Tribal
Council to terminate the employment of a community health nurse
constitutes an "internal tribal matter" within the meaning of the
Maine Indian Claims Settlement Act of 1980, 25 U.S.C. 1721 -
1735. The district court held that it does not. We disagree. 
That employment termination decision is an "internal tribal matter"
and, as such, cannot be challenged in the courts of Maine pursuant
to the Maine Human Rights Act (MHRA), Me. Rev. Stat. Ann. tit. 5,
4551 et seq.
I.
The undisputed material facts are recounted thoroughly in the
district court's opinion. See Penobscot Nation v. Fellencer, 999
F. Supp. 120 (D. Me. 1998). We provide only a brief sketch to set
the stage. Cynthia A. Fellencer was employed by the Penobscot
Nation as a Community Health Nurse/Diabetes Program Coordinator
(community nurse) from December 1992 until September 1994, when the
Penobscot Nation Tribal Council voted to terminate her employment.
Fellencer, who is a non-Indian, filed a charge of discrimination
with the Maine Human Rights Commission (MHRC) alleging that she had
been discharged due to her race and national origin. The MHRC
dismissed her complaint for lack of jurisdiction, finding that
adjudication of the claim "would create a serious potential of
State interference with the internal affairs of the tribal
government, a result clearly not intended by the Maine Indian
Settlement Act." MHRC Administrative Dismissal, Case No. E94-0730
(Jan. 30, 1995). 
Fellencer subsequently filed suit in the Maine Superior Court
against the Penobscot Nation, claiming that the Nation had
terminated her employment (1) without due process and (2) "due to
her race and/or national origin in violation of the Maine Human
Rights Act." She claims that subsequent to her termination the
community nurse position was posted with an express preference for
Indian applicants. The Nation filed a motion to dismiss, which was
denied. 
On October 20, 1997, the Nation filed the instant action in
the federal district court seeking a preliminary injunction to stay
the state court proceeding. Cross motions for summary judgment
were filed. On March 13, 1998, the district court denied the
Nation's request for a preliminary injunction and entered judgment
in favor of Fellencer, thereby permitting the state court case to
proceed. The district court's denial of the preliminary injunction
can be reversed where there has been a "misapplication of the law
to particular facts" or an "application of the wrong legal
standard." See Planned Parenthood League of Mass. v. Bellotti, 641
F.2d 1006, 1009 (1st Cir. 1981); see also Narragansett Indian Tribev. Narragansett Elec. Co., 89 F.3d 908, 912 (1st Cir. 1996)
(reversing district court's denial of preliminary injunction). We
conclude that there was a misapplication of the law. 
II.
The backdrop to the state and federal court proceedings is
some familiar history. In the early 1970s, the Nation (in concert
with the Passamaquoddy Tribe and others) filed suit claiming nearly
two-thirds of Maine's land mass as their ancestral homelands. SeePassamaquoddy Tribe v. Maine, 75 F.3d 784, 787 (1st Cir. 1996)
(citing Joint Tribal Council of the Passamaquoddy Tribe v. Morton,
528 F.2d 370 (1st Cir. 1975)). After federal authorities
interceded, the parties negotiated a compromise which was approved
by Maine, the Penobscots, the other Indian parties, and Congress. 
The compromise is memorialized in two statutes: the Maine
Implementing Act, Me. Rev. Stat. Ann. tit. 30, 6201-14 (the
Implementing Act), and the Maine Indian Claims Settlement Act, 25
U.S.C. 1721-35 (the Settlement Act). The settlement represented
a partial victory for the Nation and Maine: the Nation obtained
federal recognition as an Indian tribe and received almost one half
of $81.5 million appropriated under the Settlement Act (see 25
U.S.C. 1733) and, in exchange, the Nation's claims against Maine
were extinguished. Further, while the Nation's right to self-
government was preserved to a limited extent, Maine was permitted
to extend its jurisdiction over the Nation to a greater degree than
most states exercise over other Indian tribes. See Akins v.
Penobscot Nation, 130 F.3d 482, 484-85 (1st Cir. 1997).
As a result of the settlement, the relationship between the
Penobscot Nation and Maine is governed primarily by the
Implementing Act (state) and the Settlement Act (federal). The
Implementing Act provides as follows:
[T]he Passamaquoddy Tribe and the Penobscot Nation,
within their respective Indian territories, shall have,
exercise and enjoy all the rights, privileges, powers and
immunities, including, but without limitation, the power
to enact ordinances and collect taxes, and shall be
subject to all the duties, obligations, liabilities and
limitations of a municipality of and subject to the laws
of the State, provided, however, that internal tribal
matters, including membership in the respective tribe or
nation, the right to reside within the respective Indian
territories, tribal organization, tribal government,
tribal elections and the use or disposition of settlement
fund income shall not be subject to regulation by the
State.

Me. Rev. Stat. Ann. tit. 30, 6206(1) (emphasis added). We have
previously recognized that "[a]s to state law, the Penobscot Nation
and Maine expressly agreed that, with very limited exceptions, the
Nation is subject to the laws of Maine." Akins, 130 F.3d at 484-
85.
The Implementing Act was incorporated by reference into the
Settlement Act, 25 U.S.C. 1721-1735. See 25 U.S.C. 
1721(b)(3). In ratifying the Implementing Act, Congress sought to
balance Maine's interest in continuing to exercise jurisdiction
over the Nation's land and members (which it had done without
interference for almost two centuries), see Bottomly v.
Passamaquoddy Tribe, 599 F.2d 1061, 1064-65 (1st Cir. 1979), with
the Nation's "independent source of tribal authority, that is, the
inherent authority of a tribe to be self-governing." S. Rep. No.
96-957, at 29 (1980) (citing Santa Clara Pueblo v. Martinez, 436
U.S. 49 (1978)). Both the House and Senate sought to assuage the
Nation's fears that the settlement undermined its sovereignty:
While the settlement represents a compromise in which
state authority is extended over Indian territory to the
extent provided in the Maine Implementing Act, ... the
settlement provides that henceforth the tribes will be
free from state interference in the exercise of their
internal affairs. Thus, rather than destroying the
sovereignty of the tribes, by recognizing their power to
control their internal affairs ... the settlement
strengthens the sovereignty of the Maine Tribes.

S. Rep. No. 96-957, at 14; H.R. Rep. No. 96-1353, at 14-15,
reprinted in 1980 U.S.C.C.A.N. at 3790.
III.
As the language of the Implementing Act and the federal
legislative history make clear, the critical phrase to analyze in
determining the scope of tribal sovereignty is "internal tribal
matters." When the Nation acts on "internal tribal matters," its
actions are not subject to regulation by the state. Me. Rev. Stat.
Ann. tit. 30, 6206(1). Because the phrase "internal tribal
matters" was adopted by the federal Settlement Act, the meaning of
that phrase raises a question of federal law. See Akins, 130 F.3d
at 485; see also Bottomly, 599 F.2d at 1066 ("until Congress acts,
the tribes retain their [] sovereign powers").
Before we examine the language of the Implementing Act, we
must acknowledge some general principles that inform our analysis
of the statutory language. First, Congress' authority to legislate
over Indian affairs is plenary and only Congress can abrogate or
limit an Indian tribe's sovereignty. See U.S. CONST., art. I, 8,
cl. 3; Morton v. Mancari, 417 U.S. 535, 551-53 (1974) (discussing
the plenary power of Congress to deal with special problems of
Indians); see also F. Cohen, Handbook of Federal Indian Law 231
(1982 ed.) ("Neither the passage of time nor apparent assimilation
of the Indians can be interpreted as diminishing or abandoning a
tribe's status as a self governing entity."). Second, special
rules of statutory construction obligate us to construe "acts
diminishing the sovereign rights of Indian tribes ... strictly," 
Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 702 (1st
Cir. 1994), "with ambiguous provisions interpreted to the
[Indians'] benefit," County of Oneida v. Oneida Indian Nation of
New York, 470 U.S. 226, 247 (1985). These special canons of
construction are employed "in order to comport with the[]
traditional notions of sovereignty and with the federal policy of
encouraging tribal independence," White Mountain Apache Tribe v.
Bracker, 488 U.S. 136, 143-44 (1980), and are "rooted in the unique
trust relationship between the United States and the Indians," 
County of Oneida, 470 U.S. at 247.
A. The Language of the Statute
The Implementing Act preserves the Nation's sovereignty with
respect to
internal tribal matters, including membership in the
respective tribe or nation, the right to reside within
the respective Indian territories, tribal organization,
tribal government, tribal elections and the use or
disposition of settlement fund income ....

Me. Rev. Stat. Ann. tit. 30, 6206(1). While the list of
exemplars following "internal tribal matters" informs the meaning
of that term, the list is not exclusive or exhaustive. In fact, we
declared in Akins that the exemplars "provide limited guidance." 
Akins, 130 F.3d at 486. We also recognized in Akins that the fact
"[t]hat a tribe attempts to govern a matter does not render it an
internal tribal matter." Id. 
B. The Akins Precedent
Akins was our first occasion for addressing the allocation of
sovereign powers between the Nation and the State of Maine pursuant
to the Implementing Act and the Settlement Act. The Nation had
adopted a policy allowing only enrolled members of the tribe who
lived on the reservation to be eligible for timber permits to
harvest timber on tribal lands. See Akins, 130 F.3d at 483. 
Akins, an enrolled tribal member who had moved off the reservation,
lost his timber permit as a result of the change in policy. Id. at
483-84. Akins sued in federal court, claiming that the Nation had
violated his rights to due process and equal protection, and that
the Nation had violated his right to be free from bills of
attainder. Id. at 484. We held that Akins' claims involved an
"internal tribal matter" and were subject to the exclusive
jurisdiction of the tribal courts. Id. at 490.
We identified five considerations in Akins that were
persuasive in characterizing the grant of timber rights as an
"internal tribal matter." These considerations were: (1) the
disputed policy regulated only tribal members; (2) the policy
related to lands acquired by the Nation with federal funds received
for that purpose, and the lands were considered "Penobscot Indian
Territory"; (3) the policy affected the Nation's ability to
regulate its natural resources; (4) at least on its face, the
policy did not implicate or impair the interest of the State of
Maine; and (5) the recognition that the timber harvesting policy
involved an "internal tribal matter" was consistent with prior
legal understandings. Akins, 130 F.3d at 486-87. We did not
offer these considerations as an essential test for determining
which tribal actions constitute "internal tribal matters," see id.at 487 (noting that "generalizations in this subject [of tribal
authority] have become ... treacherous" and that "[w]e tread
cautiously and write narrowly"), and we do not offer them now for
that purpose. Instead, we use the Akins considerations as one
source of guidance in resolving this case. And, in the spirit of
Akins, we consider another pertinent factor, the nature of the
position involved in this case. 
Evaluating all of these considerations, with particular
emphasis on the interest of the State of Maine, prior legalunderstandings, and the nature of Fellencer's position, we conclude
that the decision of the Nation to terminate Fellencer's employment
was an "internal tribal matter."
C. The Akins Considerations
1. Within the Tribe 
Although Fellencer, unlike Akins, is not a member of the
Nation, and hence the effect of the decision at issue is not
limited to tribal members, the decision to terminate Fellencer as
the community health nurse affects many tribal members but only one
non-tribal member (Fellencer). This limited impact beyond the
Nation distinguishes this case from Penobscot Nation v. Stilphen,
461 A.2d 478 (Me. 1983), wherein the Maine Supreme Judicial Court
held that a "beano" game, a tribal enterprise designed to involve
many non-tribal members, did not become an "internal tribal matter"
simply because an Indian tribe administered it, or because an
Indian tribe funded government services with the beano game's
profits. See id. at 486. Holding that the public gambling events
were "related to tribal self-government only because of the use to
which its profits are put," the Stilphen Court held that the tribe
had "no inherent right to 'market an exemption from state
taxation'" to the public. Id. (quoting Washington v. Confederated
Tribes of the Colville Indian Reservation, 447 U.S. 134, 156
(1980)). The "beano" games in Stilphen were designed to "draw many
hundreds of players to the Penobscot reservation from all over
Maine and beyond." Stilphen 461 A.2d at 480. Here the employment
decision has its immediate effect on only one non-tribal member.
2 & 3. Land and Natural Resources
The second and third considerations in Akins related to the
commercial use of tribal lands ("the very land that defines the
territory of the Nation," Akins, 130 F.3d at 487), and the "growth,
health, and reaping" of the tribe's natural resources. Id. 
Although this case does not involve tribal land and natural
resources, it does involve the Nation's human resources and its
judgment that a different community health nurse will better serve
the health of tribal members. See Montana v. United States, 450
U.S. 544, 566 (1981) (recognizing that Indian tribes may "retain
inherent power to exercise civil authority over the conduct of non-
Indians on fee lands within its reservation when that conduct
threatens or has some direct effect on the . . . health or welfare
of the tribe"). 
4. Interest of Maine
As a generality, Maine has a strong interest in protecting all
employees against discrimination through its Human Rights Act. SeeMe. Rev. Stat. Ann. tit. 5, 4552; see also Maine Human Rights
Comm'n v. Local 1361, United Paperworkers Int'l Union, 383 A.2d
369, 373 (Me. 1978)(stating that the MHRA "was meant to have very
broad coverage"). In this case, however, the State is not
attempting to apply its laws to the Nation's employment decision. 
To the contrary, the Maine Attorney General ruled long before this
case that "the employment decisions of the Penobscot Nation, when
acting in its capacity as a tribal governmental employer, are not
subject to regulation by the state[.]" Maine Attorney General
Opinion No. 84-22 (July 25, 1984). Thus, while the United States
intervened in this case to argue that an employment decision by the
Nation is an "internal tribal matter" and therefore not subject to
the MHRA, Maine did not intervene to argue to the contrary. In
Akins we found this posture significant. Even though Akins alleged
violations of Maine law, we noted that there was "not a dispute
between Maine and the Nation over the attempted enforcement of
Maine's laws." Akins, 130 F.3d at 487 (emphasis added). The
situation here is even more favorable to the Nation. The state
disavows the very "state interest" that Fellencer seeks to invoke
in support of her private cause of action.
5. Prior Legal Understandings
Prior legal understandings strongly support the Nation's claim
of exemption from challenge in state court to its employment
termination decision. In the employment discrimination context,
Congress exempted Indian tribes from Title VII's definition of
"employer" in the original passage of the Civil Rights Act of 1964. 
42 U.S.C. 2000e(b) ("[T]he term 'employer' means a person engaged
in an industry affecting commerce . . . . Such term does not
include . . . an Indian tribe"). The Supreme Court has
characterized this exemption as "Congress' recognition of the
longstanding federal policy of providing a unique legal status to
the Indians in matters of tribal employment," and it characterized
Congressional intent as a "policy of furthering Indian self-
government." Morton v. Mancari, 417 U.S. 535, 548, 551 (1974)
(emphasis added). 
General federal Indian civil rights law, outside the
employment discrimination context, further bolsters the conclusion
that Fellencer's claim involves an "internal tribal matter." Even
though Indian tribes were exempted from Title VII coverage,
Congress subsequently enacted the Indian Civil Rights Act of 1968
(ICRA), 25 U.S.C. 1301-41, made applicable to the Penobscot
Nation through the Settlement Act, 25 U.S.C. 1725(h). See Akins,
130 F.3d at 486. Under the ICRA, "[n]o Indian tribe in exercising
powers of self-government shall . . . deny to any person within its
jurisdiction the equal protection of its laws or deprive any person
of liberty or property without due process of law." 25 U.S.C. 
1302(8).
As fundamental as federal court jurisdiction has been to the
protection of the civil rights enumerated in section 1302(8), the
Supreme Court held in Santa Clara Pueblo v. Martinez, 436 U.S. 49,
65 (1978) that gender discrimination claims against tribes were
cognizable only in Indian tribunals. In the Supreme Court's view,
Congress did not intend to abrogate Indian tribal sovereignty to
the extent that Indian tribes could be forced to defend against
such civil rights claims in an external (non-tribal) forum: "Tribal
courts have repeatedly been recognized as appropriate forums for
the exclusive adjudication of disputes affecting important personal
and property interests of both Indians and non-Indians." Id. The
Supreme Court explained that exclusive jurisdiction has been
reposed in the Indian tribunals because subjecting such claims to
federal court jurisdiction "plainly would be at odds with the
congressional goal of protecting tribal self-government." Id. at
64.
These prior legal understandings (both the Title VII exemption
and the ICRA's grant of exclusive jurisdiction to tribal courts)
are particularly important because they inform the intent of
Congress in the adoption of the Settlement Act. We "have long
presumed that Congress acts against the background of prior law." 
Akins, 130 F.3d at 489 (citing Kolster v. INS, 101 F.3d 785, 787-88
(1st Cir. 1996)); see also Passamaquoddy Tribe, 75 F.3d at 789 ("To
[give effect to the legislative will] a court must take into
account the tacit assumptions that underlie a legislative
enactment, including not only general policies but also preexisting
statutory provisions."). The statutory provisions in Title VII and
the ICRA reflect Congress' understanding prior to the adoption of
the Settlement Act that employment discrimination claims against
Indian tribes implicate "unique" considerations, see Morton v.
Mancari, 417 U.S. at 548, and that such claims should be heard in
Indian courts. See Santa Clara Pueblo, 436 U.S. at 64-65.
Indeed, the Senate Report on the Settlement Act explicitly
cited with approval to Santa Clara Pueblo, 463 U.S. 49 (1978). See 
S. Rep. No. 96-957, at 29 (1980). Although we have refused to read
into this reference an incorporation of "all prior Indian law"
because that "would be inconsistent with the unique nature of the
Maine settlement," Akins, 130 F.3d at 489, we also recognized that
Congress "explicitly made existing general federal Indian law
applicable to the Penobscot Nation in the Settlement Act." Id. 
That body of law includes Congressional enactments excluding Indian
tribes from Title VII coverage and limiting civil rights claims
against the tribes to tribal forums. See Santa Clara Pueblo, 463
U.S. at 65-66.
The Senate Report on the Settlement Act also noted that the
Act strengthened the Nation's sovereignty "by recognizing [the
Penobscot's] power to control their internal affairs and by
withdrawing the power which Maine previously claimed to interfere
in such matters[.]" S. Rep. 96-957, at 14. The Report predicates
the Nation's right to be free from state interference on the
Nation's "inherent sovereignty" as recognized in Bottomly, 599 F.2d
1061, and State v. Dana, 404 A.2d 551 (Me. 1979). Both Bottomlyand Dana drew on federal Indian common law in recognizing the
inherent sovereignty of the Penobscot and Passamaquoddy tribes. 
See Bottomly, 599 F.2d at 1066; Dana, 404 A.2d at 560-61. The
Report states that "[i]n keeping with" the sovereignty recognized
in Bottomly and Dana, it was Congress' intent to guarantee that the
Nation "[would] be free from state interference in the exercise of
[its] internal affairs." S. Rep. 96-957 at 14. By characterizing
its recognition of the Nation's sovereignty as "in keeping with"
Bottomly and Dana, Congress signaled its intent that federal Indian
common law give meaning to the terms of the settlement. The Senate
Report continues by listing important sovereignty rights retained
by the Nation, including "the establishment of tribal courts ...
with powers similar to those exercised by Indian courts in other
parts of the country." Id. at 15. These powers included hearing
employment discrimination claims filed against the tribes.
In summary, these prior legal understandings provide strong
support for classifying a claim of national origin discrimination
based on the termination of Fellencer's employment as an "internal
tribal matter." 
D. The Nature of the Position at Issue
Apart from the statutory language, judicial precedent,
legislative history and federal Indian common law, the Nation's
employment of a community health nurse has particular "internal
tribal matter" implications because of the statutory origins of the
position. The community nurse position from which Fellencer was
dismissed is funded by the Indian Self-Determination and Education
Assistance Act of 1975 (ISDA), 25 U.S.C. 450 et seq. Congress
therein declared its policy to "respond to the strong expression of
the Indian people for self-determination by assuring maximum Indian
participation in the direction of . . . Federal services to Indian
communities." 25 U.S.C. 450a(a); see also S. Rep. No. 102-392,
at 7 (1992), reprinted in 1992 U.S.C.C.A.N. at 3949 (1992
amendments to Indian Health Care Improvement Act)("health care
provided by people of one's own culture is the most appropriate,
and results in better utilization of health care services"). 
Believing that the administration of such services by Indians was
"crucial to the realization of self-government," 25 U.S.C. 
450(a)(1), Congress included an employment preference for Indians
in the legislation. 25 U.S.C. 450e(b) (requiring that
"preferences and opportunities for training and employment . . .
shall be given to Indians").
This employment preference for Indians distinguishes the
Nation's community nurse position from any position in a regular
municipal government. Cf. Implementing Act, Me. Rev. Stat. Ann.
tit. 30, 6204 (subjecting Nation generally to same state
jurisdiction as state exercises over municipalities). Clearly,
Maine municipalities cannot employ similar preferences. The
uniqueness of the federal employment preference counsels against
the application of Maine law in this employment discrimination
context. In light of the Supreme Court's description of such
preferences in Morton v. Mancari, 417 U.S. at 553 (1974), as
furthering "self-government," and in light of the other
considerations set forth herein, we hold that the decision of the
Nation to terminate the employment of a community health nurse was
an "internal tribal matter" within the meaning of the Settlement
Act, and hence the Nation cannot be subjected to state court
jurisdiction for the adjudication of an employment discrimination
claim pursuant to the Maine Human Rights Act. 
The judgment of the district court is reversed; the case is
remanded for the entry of judgment in favor of the Nation and the
issuance of an injunction if it is deemed necessary.